COURT OF APPEALS OF VIRGINIA

Present:  Judges Beales, Decker and AtLee
Argued at Richmond, Virginia


ANDREW GILBERT SCHMUHL
                                                           OPINION BY
v.        Record No. 1572-16-4              JUDGE RANDOLPH A. BEALES
                                                      SEPTEMBER 11, 2018
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Randy I. Bellows, Judge

Bradley R. Haywood (Sheldon, Flood & Haywood, PLC; Office of
the Public Defender, on briefs), for appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


A grand jury indicted Andrew Schmuhl ("appellant") on seven felony counts for acts he

committed during a home invasion on November 9, 2014.  He was charged with two counts of

abduction with intent to gain pecuniary benefit, two counts of aggravated malicious wounding,

two counts of using or displaying a firearm during the commission of an aggravated malicious

wounding, and burglary while armed with a deadly weapon.  Appellant filed a pretrial notice of

his intent to pursue an involuntary intoxication defense.  Based upon this theory, appellant

sought to present evidence of his mental state on the night in question.  Specifically, appellant

intended to show that he was suffering from "a medication induced delirium."  The trial court,

however, ruled that such evidence was not admissible under appellant's involuntary intoxication

defense because appellant did not argue that he was insane.  Subsequently, after a more than

three-week jury trial, appellant was convicted on all seven charges, and he was sentenced to two

terms of life in prison plus an additional 98 years.  Following a timely appeal to this Court, we

granted six of the twelve assignments of error appellant raised in his petition for appeal.[1]  We are now reviewing the following assignments of error:

> VII.   The trial court erred in finding that Stamper v. Commonwealth bars evidence of *mens rea* unless the defendant presents a statutory insanity defense.

> VIII.  The trial court erred in finding that delirium, as well as other serious effects of drugs, were insanity defenses, and not properly the subject of an involuntary intoxication defense. The error derived from application of the wrong standard for distinguishing between intoxication and insanity.

> IX.    The trial court erred in circumscribing the manner in which the defendant was permitted to prove affirmative defenses, such as by excluding expert evidence, redacting records, and barring the use of certain words.

> X.     The trial court erred in excluding mental state evidence offered in support of an unconsciousness defense.

> XI.    The trial court erred in refusing an unconsciousness jury instruction, finding that unconsciousness merged with intoxication in this case.

> XII.   The trial court erred in denying an instruction defining intoxication.

For the reasons that follow, we now affirm appellant's convictions.

## I. BACKGROUND

### A.  The Home Invasion

"Applying familiar principles of appellate review, we will state the facts in the light most favorable to the Commonwealth," as we must, because the Commonwealth was the prevailing party in the trial court.  Ervin v. Commonwealth, 57 Va. App. 495, 499, 704 S.E.2d 135, 137 (2011) (*en banc*).  So viewed, the evidence established that on the evening of November 9, 2014,

---

[1] We have adopted, for the sake of consistency, the numbering convention that appellant used in his petition for appeal in listing his assignments of error.  We denied appellant's assignments of error I through VI.

Leo Fisher ("Fisher") was in his McLean, Virginia home with his wife, Susan Duncan ("Duncan"). Duncan was preparing dinner when she alerted Fisher that a vehicle had come up their driveway. When the doorbell rang, Fisher answered the door. As he opened it, an intruder (later determined to be appellant) pushed the door inward and knocked Fisher off balance, forcing his way into the home. Appellant used a Taser on Fisher to subdue him. He also then bound Fisher's hands and feet with plastic zip ties.

Hearing what she described as "some weird noises," Duncan testified that she went to the foyer where she found Fisher lying on the floor. She stated that appellant then came toward her, grabbed her, and bound her hands and feet with zip ties. Appellant flashed a badge and identified himself as being with the "Virginia SEC."[2] He said he was arresting Fisher because he claimed that Fisher had "sent an email placing a hit on a member of the Knights [Templar]," a drug cartel, in the amount of $370,000.

Appellant then forcibly moved the couple to their back bedroom and closed the curtains. During the move to the bedroom, Fisher recognized the intruder as Andrew Schmuhl. Fisher had met appellant on numerous occasions because appellant's wife, Alecia Schmuhl, had worked as an attorney in the law firm where Fisher was the managing partner.[3] Fisher also testified that he had fired Alecia Schmuhl for performance-related reasons on October 27, 2014 – approximately two weeks prior to the home invasion. However, Fisher did not let appellant know that he

---

[2] There is no such government agency in the Commonwealth as the "Virginia SEC," and appellant concedes as much in his opening brief to this Court.

[3] Fisher testified that he first met appellant at the firm's holiday party in 2013. Appellant had also worked for Fisher's firm as a contract attorney on a single project. Fisher further recalled that in June 2014, appellant and his wife came to Fisher's office at the law firm to discuss an administrative matter. During the meeting, which lasted approximately ten minutes, Fisher described appellant's demeanor as angry and "really aggressive." Appellant "kept raising his voice. His voice kept getting louder and louder." Fisher testified that he repeatedly had to ask appellant to leave his office before appellant ultimately left.

recognized appellant because he did not want to "do anything that would upset him or get him angry."

In the bedroom, appellant "started interrogating [the couple]." Fisher stated that appellant "seemed like he had a set of questions in different topics that he was going to ask us about. And to me he seemed to be going through it quite systematically." Fisher described appellant as "acting like a lawyer taking a deposition," and he indicated that appellant asked appropriate follow-up questions.

Appellant also asked Fisher, "[D]o you know why anybody would've put a hit on you?" Fisher recounted the specific exchange between him and appellant to the jurors: "I said, I don't know why anybody would do that. And [appellant] said, well, didn't you let somebody go lately? And at first I wasn't sure what he meant but he -- I realized he was talking about Alecia. He never used her name." Fisher acknowledged that he had recently fired someone, and, despite the fact that no one had mentioned Alecia's name, appellant asked, "[W]hy was she let go?"

When appellant moved the couple from the bedroom to the home office, he closed multiple window blinds, which prevented anyone outside the home from observing the events inside. Appellant told the couple that "there might be a sniper" outside.

Both Fisher and Duncan testified that appellant communicated with a third person during the course of the home invasion. Duncan testified, "Once I saw him out in the foyer . . . . He was flipping [the outdoor lights] on and off signaling somebody." Another time, Duncan observed that appellant "had th[e] door wide open and he was standing [t]here and he was talking to a woman outside." Fisher testified that appellant stepped away from the couple to speak on the phone at least five times during the home invasion. "[A]fter each call he would say things like, I was just talking to my partner. Sometimes he would say I was talking to my boss." Appellant directed Fisher to access and open his office email, which Fisher testified contained

information on the firm's employees as well as other information valuable to the firm. Appellant searched through some of the emails and, according to Fisher's testimony, became frustrated after apparently failing to find the information for which he was looking.

After appellant moved the couple back to the bedroom, he separated them by placing Duncan in the bathroom. Appellant told Duncan that separating them was necessary "because there may be things your husband won't tell me in front of you." Fisher testified that appellant's questioning then continued on various topics. Appellant asked Fisher whether the couple kept a large amount of money in the house. Fisher testified that he thought, "Maybe he wants money." He further testified, "And so I said to him, 'you know, we don't have any money here but we can go to the bank.'"

Appellant then attacked Fisher. "[H]e knocked me over, put a pillow over my face and cut my throat on the bed." Appellant also stabbed Fisher in the head and in the left shoulder. Fisher screamed to Duncan, "[H]e's killing me!" Duncan, upon leaving the bathroom, saw appellant "on top of Leo and he was cutting his throat." Appellant yelled, "Get out, ma'am, get out now! Don't come in here, get out!" Duncan testified that she saw appellant raise a gun "[s]o I turned my head but I felt the bullet hit me. I fell down on the floor. And then I got up, I felt myself getting up and I knew I was alive." The bullet had grazed Duncan's head and had lodged in the ceiling.

As Duncan reached for a nearby phone, appellant jumped on her and stabbed her repeatedly across her neck, back, and shoulders. Appellant only ceased his attacks when Duncan pretended to be dead. As appellant left the room, Fisher testified, "I was on the floor and he came past me and he kicked me in the head . . . . [H]e said, 'You're going to die.'"

Duncan hit the panic button on the home's security system, thereby activating an audible alarm. As she went to call 911, she saw appellant in the front foyer as he left the house. After

the police arrived, multiple officers noticed the odor of gas, and it was later determined that gasoline had been poured on the rug in the foyer. No gasoline was on the rug prior to that evening.

Fisher and Duncan were able to observe appellant's demeanor while he was in their home for approximately three hours. Duncan characterized appellant as "very forceful, authoritative. Very much in control." Even though appellant argued that he was overmedicated, and, thus, involuntarily intoxicated, Duncan testified that appellant did not stumble or slur his speech. Fisher likewise testified that appellant did not slur his speech at any point during the home invasion.

## B. Pursuit and Arrest of Appellant

The first police officers to arrive at the home found Fisher on the front porch. Fisher was bleeding severely from his neck, and Officer Joseph Shifflett testified that he had to stuff his hands inside the wounds in Fisher's neck to slow the bleeding. Despite the severity of his wounds, Fisher was conscious and identified appellant as his attacker. A "flash message" was then sent to police units to be on the lookout for appellant's vehicle.

Officer Daniel Custard testified that, approximately ten minutes later, he identified appellant's vehicle, which was traveling on Interstate 495. The officer stated that he activated his vehicle's lights and siren, but appellant's vehicle refused to pull over. Officer Custard pursued the vehicle and could see two individuals inside it. Custard testified that he "observed the passenger in the vehicle reaching all over the vehicle, [he] appeared to be reaching under the seat and removing his clothing."

After appellant's vehicle finally stopped, police took the driver, Alecia Schmuhl, into custody. Appellant exited the vehicle, "wearing only an adult diaper." Officer Custard ordered appellant to the ground, and appellant was responsive to the officer's commands. He then

handcuffed appellant and placed him in the back of the police vehicle. After a brief period of time, Custard returned to that police vehicle and observed a change in appellant's condition. He testified, "I noticed that there was a pretty distinct change in his level of consciousness. When I first spoke to him, he was very lucid, he was able to answer questions easily . . . . [W]hen I returned to him he appeared to be almost passing out." Officer Custard further stated that appellant's eyes were "in the back of his head" and that he "had an altered level of consciousness." Custard asked appellant if he had taken anything illegal or any medications, and appellant told Custard that he had taken Dilaudid and fentanyl.

Officer Daniel Curcio observed appellant's demeanor after his arrest and at the hospital. While appellant sat in the back of the police vehicle, Officer Curcio noticed that "he was a little lethargic . . . . He seemed like he was kind of dazed, a little in and out." Officer Curcio also testified that appellant briefly spoke to him in German. Based upon appellant's condition, Curcio asked appellant's wife, who was in a different police vehicle, if appellant had taken any medication. She informed him that appellant had an implant for a back injury. Curcio testified that he believed EMTs on the scene also removed a fentanyl patch from appellant's upper left arm. Later, at the hospital, medical personnel also removed a second fentanyl patch, which was hidden beneath appellant's adult diaper. Officer Curcio also heard appellant tell medical staff that "he had taken a handful of a muscle relaxer," called Tizanidine.

### C. Evidence Recovered from Appellant's Vehicle

Officer Matthew Keisling testified at trial regarding the physical evidence found in appellant's vehicle. Police recovered various pieces of clothing – some of which appeared to be stained with blood. The clothing was wet and smelled strongly of ammonia, and Officer Keisling testified that the odor of ammonia in the vehicle was overwhelming. Police also

recovered a soda bottle that contained a small amount of liquid that smelled strongly of ammonia.

In the vehicle's center console, police recovered a pill bottle labeled "Tizanidine HCl" – the same muscle relaxer that appellant told officers he had "taken a handful of." They also recovered Alecia Schmuhl's purse, which contained a list written in appellant's handwriting, according to a handwriting expert who testified for the Commonwealth. The list stated: "handcuffs, two bottles of Nyquil, two packs of Benadryl, adult diapers (male), two sleeping masks (if available)."

In a shopping bag, police found a disassembled handgun and five cartridges – one of which had already been fired. They also found a backpack that contained numerous items, including handcuffs, rubber gloves, a blood-stained knife, a package of zip ties, a box of Benadryl, two bottles of Nyquil, and a dark jacket. Inside the jacket were numerous items, including a Taser, Taser cartridges (two of which had been fired, as evidenced by the exposed wires and Taser darts), and a piece of tape that had been used to collect the anti-felon identification devices (AFIDS) that a Taser releases when fired. Officer Keisling further testified that no cartridges were found in the couple's home.

Police also recovered two prepaid cell phones from the vehicle, one of which had its battery removed and its SIM card broken in half.[4] The phones were activated on November 7, 2014 – two days before the home invasion. On November 9, 2014, numerous calls were made between the two prepaid phones during the time that appellant was in the victims' home. One of

---

[4] Officer Brian Bayliss, a member of the Fairfax County computer forensic section, testified that "SIM" stands for "subscriber identity module" and that a cell phone's SIM card "identifies the person that has the actual subscription or the account that is billed." Officer Bayliss also testified that "a prepaid phone is very cheap and it can be paid for . . . with cash, and since it's paid with cash, it's very difficult to trace back to an actual account holder or subscriber."

the prepaid phones was physically in the vicinity of the victims' home between 6:33 p.m. and 9:46 p.m. After appellant and his wife were taken into custody, police searched their home and recovered their regular personal cell phones. Thus, neither appellant nor his wife were actually carrying their personal cell phones at the time of their arrest on November 9, 2016, as they had left them at home.

D. Pretrial Hearings on the Admissibility of Expert Witness Testimony

Before trial, on November 20, 2015, defense counsel filed a notice which stated:

> Andrew Schmuhl intends to assert at trial that his mental state at
> the time of the offense met the legal standard for insanity, and [he]
> intends to present evidence, including expert testimony, in support
> of this defense. His mental state at the time of the offense resulted
> from the use of medication.

The Commonwealth then filed motions to conduct its own evaluation of appellant's mental health and to review the report prepared by appellant's mental health expert. Appellant opposed the Commonwealth's motions, arguing that the provisions of Code § 19.2-168.1 and § 19.2-169.5 did not apply to an involuntary intoxication defense. On November 30, 2015, the trial court conducted a hearing on the Commonwealth's motions and asked defense counsel to clarify his position on whether appellant was asserting an insanity defense, which entitled the Commonwealth to the motioned-for discovery. The trial judge stated:

> I think you have to elect either you have given the Court an
> insanity notice . . . and I will treat it as such and proceed from there
> or you tell me it's not an insanity notice even though when I read it
> I thought it was, but if you tell me it's not, I believe I have to
> accept your representation because you get to choose.

Defense counsel confirmed, "It's an involuntary intoxication notice . . . not an insanity notice," and based upon this representation, the trial judge denied the Commonwealth's motions.

On December 23, 2015, the trial court conducted a second hearing to determine whether expert testimony about appellant's mental state would be admissible at trial. Prior to this

hearing, the trial judge submitted questions to defense counsel to assist the court in resolving the question of admissibility.[5] However, defense counsel declined to answer these questions and argued that his client could not be compelled to disclose trial strategy. The judge specifically inquired if defense counsel was willing to resolve the issue of expert witness testimony prior to trial. The trial judge stated:

> [I]s it your position that this . . . ought not happen until we're in the middle of trial after opening statement; after you have made representation[s] presumably to the jury about what they are going to hear. That at that point and only at that point will this Court be able to make a ruling on the specifics of an expert testimony?

Defense counsel subsequently acknowledged on the record that he understood the risk of not resolving the issue before trial. Defense counsel stated:

> [W]e'll have to take the time out maybe it's a two hour hearing . . . in the middle of trial to determine at that point whether the expert can testify [to] what we want them to testify to. If it's excluded . . . we are taking that risk.

Ultimately, the trial court asked whether defense counsel was "unwilling to make a proffer as to the nature of . . . any expert mental health testimony [that he] wish[ed] to offer prior to trial." Defense counsel stated that he was unwilling to make such a proffer, and he further argued that the trial court ran the risk of violating appellant's constitutional rights if the court ordered such a disclosure before trial. As a result, the issue of the admissibility of expert witness testimony remained unresolved before trial.

---

[5] The record indicates that the trial court submitted questions to defense counsel to ascertain "whether you intend to call a mental health expert who will be relying upon any mental health records that may exist for Mr. Schmuhl and . . . on interviews conducted by your mental health experts with Mr. Schmuhl." The trial court also sought to determine whether expert testimony would be specific to appellant or whether it would be more general in nature.

E.  The Court's Rulings During Trial on the Admissibility of Evidence and on Jury Instructions

On May 27, 2016, during the trial, the trial court conducted a hearing on the admissibility of expert witness testimony.  During that hearing, defense counsel informed the court about the nature of its expert testimony.  Defense counsel stated:

> [Appellant] was suffering from . . . a medication induced delirium. The diagnostic criteria for delirium include dramatically altered mental state that develops over a short period of time, from hours to days.  It lasts from days to months, but it is temporary and it eventually results in full recovery, often quite rapid.  It fluctuates in severity, meaning it waxes and wanes over the course of the days, weeks, months, however long it lasts.

Defense counsel stated that "the way the law is written, we are sitting on a defense that's premised on temporary insanity," and he argued that the "expert should be permitted to testify in equal degree as one would in an insanity case . . . ."

Following the hearing, the trial court ruled that appellant could not "offer expert mental health testimony in support of its 'medication-induced delirium' defense," because, "[t]he concern the Court expressed to defense counsel on December 23rd – that 'what you're dealing with is in fact an insanity defense that is not called an insanity defense' – has been realized." However, the trial court expressly stated, "Assuming a proper foundation is laid, this Order does not preclude the defendant from calling an expert to address the toxicological effects of ingested medications."  On June 1, 2016, defense counsel made an additional proffer that it intended "to introduce psychiatric testimony in support of the defense of unconsciousness."  Based on this additional proffer, the trial court likewise ruled that appellant was "preclude[d] . . . from offering expert mental health testimony on an unconsciousness defense."

Pursuant to the court's decision to permit toxicological testimony but not "psychiatric testimony," the court did not allow appellant's expert witness to use words like "delirium,"

"psychosis," "dissociation," and "delusions." The court also redacted statements relating to appellant's psychiatric history from appellant's medical records, which were admitted at trial.

During argument on jury instructions, the court refused appellant's jury instruction defining and describing "unconsciousness," finding that the instruction on involuntary intoxication adequately covered appellant's defense of unconsciousness. The court also refused appellant's jury instruction defining "intoxication," which the court found to be a word of common usage, and instead permitted the parties to argue the meaning of the word "intoxication" before the jury.

II. ANALYSIS

A. Standard of Review

"It is well established that the admissibility of expert testimony is within the sound discretion of the trial court, and that court's decision will not be disturbed absent an abuse of discretion." Patterson v. Commonwealth, 3 Va. App. 1, 11, 348 S.E.2d 285, 291 (1986). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." Tynes v. Commonwealth, 49 Va. App. 17, 21, 635 S.E.2d 688, 689 (2006). "However, to the extent the trial court makes an error of law in the admission of evidence, 'an abuse of discretion occurs.'" Abney v. Commonwealth, 51 Va. App. 337, 345, 657 S.E.2d 796, 800 (2008) (quoting Bass v. Commonwealth, 31 Va. App. 373, 382, 523 S.E.2d 534, 539 (2000)). "Furthermore, such evidentiary issues presenting a 'question of law' are 'reviewed *de novo* by this Court.'" Id. (quoting Michels v. Commonwealth, 47 Va. App. 461, 465, 624 S.E.2d 675, 678 (2006)).

B. The Trial Court's Interpretation of Stamper

Appellant argues that the trial court erred when it interpreted the Supreme Court's holding in Stamper v. Commonwealth, 228 Va. 707, 324 S.E.2d 682 (1985), to bar evidence of

*mens rea* unless a defendant presents an insanity defense. We review assignment of error VII *de novo*. Abney, 51 Va. App. at 345, 657 S.E.2d at 800.

In Stamper, the Supreme Court of Virginia affirmed the trial court's refusal to allow Walter Stamper to introduce evidence that, although he was not insane, he was manic-depressive and in a "manic state" on the date that he committed the offense for which he was convicted. 228 Va. at 715-16, 324 S.E.2d at 687. Stamper sought to argue that his diminished mental state rendered him incapable of forming the intent to distribute, a required element for his conviction. Id. at 716, 324 S.E.2d at 687. The Supreme Court rejected Stamper's argument, declining to recognize diminished capacity as a defense in the Commonwealth and further rejecting the approach that expert evidence could be used, in the absence of an insanity defense, to show that Stamper lacked the necessary *mens rea*. Id. at 716-17, 324 S.E.2d at 688.

The Supreme Court in Stamper expressly held "that evidence of a criminal defendant's mental state at the time of the offense is, in the absence of an insanity defense, irrelevant to the issue of guilt." Id. at 717, 324 S.E.2d at 688. The Court noted that the fundamental reason for the exclusion of this evidence rests on Virginia's adherence, through the M'Naghten rule, to the common law's use of a "stable and constant standard of mental competence as the criterion for the determination of criminal responsibility."[6] Id. at 716, 324 S.E.2d at 688. Under the common law and in the Commonwealth, "[a] person whose mental state falls outside the borderline drawn

---

[6] The M'Naghten rule states

> that to establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong.

Price v. Commonwealth, 228 Va. 452, 457, 323 S.E.2d 106, 109 (1984) (quoting M'Naghten's Case, 10 Cl. and F. 200, 210, 8 Eng. Rep. 718, 722-23 (1843)).

by that standard is deemed legally insane. All persons inside that borderline are 'presumed to be sane, and to possess a sufficient degree of reason to be responsible for [their] crimes.'" Id. at 716-17, 324 S.E.2d at 688 (quoting Price v. Commonwealth, 228 Va. 452, 457, 323 S.E.2d 106, 109 (1984) (quoting M'Naghten's Case, 10 Cl. and F. 200, 210, 8 Eng. Rep. 718, 722-23 (1843))). In its decision, the Stamper Court emphasized what has always been the case in the Commonwealth – i.e., that "there is no sliding scale of insanity." Id. at 717, 324 S.E.2d at 688. The reasoning behind a bright-line rule separating the sane, who are held criminally responsible, and the insane, who are not, is that the "classifications and gradations applied to mental illnesses, disorders, and defects" are subject to frequent revision. Id. at 716, 324 S.E.2d at 688. The resolution of each case cannot be "dependent upon these subtle and shifting gradations." Id.

Appellant argues that the holding in Stamper is inapplicable to the case at bar because, according to appellant, the Supreme Court in Stamper simply reaffirmed that the Commonwealth does not recognize the diminished capacity defense and reiterated that the M'Naghten rule continues to apply to insanity defenses. He contends that Stamper does not limit evidence of a defendant's mental state when the accused utilizes the defense of involuntary intoxication. We disagree for several reasons.

First, appellant's argument attempts to ignore the express holding of the Supreme Court in Stamper. The Court made clear that the only way to negate *mens rea* with evidence of a defendant's mental state is to plead an insanity defense.[7] The Supreme Court's holding makes no exception for a defense premised on a defendant's involuntary intoxication. Since Stamper, this Court has repeatedly held that evidence of a defendant's mental state is "immaterial" and

---

[7] This holding is subject to the well-recognized exception that a defendant charged with premeditated murder may negate his *mens rea* for the offense with evidence of his mental state at the time of the offense – without pleading insanity. Fitzgerald v. Commonwealth, 223 Va. 615, 631, 292 S.E.2d 798, 807 (1982).

- 14 -

"irrelevant" to the issue of *mens rea* where the defendant failed to put forth an insanity defense. Id.; see Peeples v. Commonwealth, 30 Va. App. 626, 633-34, 519 S.E.2d 382, 385 (1999) (*en banc*) (citing Stamper and affirming the trial court's exclusion of expert testimony about the defendant's mental disability, offered to support his defenses of heat of passion and self-defense, when he did not allege an insanity defense); Bowling v. Commonwealth, 12 Va. App. 166, 172-73, 403 S.E.2d 375, 378-79 (1991) (citing Stamper and affirming the trial court's exclusion of expert testimony offered to show that the defendant's "borderline mental capacity" prevented him from forming the intent to distribute narcotics, when he did not allege insanity).

Second, the defendant who pleads involuntary intoxication still falls squarely within the rule set in Stamper because involuntary intoxication is recognized in the Commonwealth as an alternative basis for an insanity defense, proven not by showing that the defendant had a pre-existing mental disease or defect, but by showing that his involuntary intoxication produced a defect in his *mens rea* that rose to the level of insanity, as set by the M'Naghten rule. In Morgan v. Commonwealth, 50 Va. App. 120, 132-34, 646 S.E.2d 899, 905-06 (2007), we affirmed a trial court's decision to place both the burdens of production and persuasion on the defendant when he pled an "insanity defense of involuntary intoxication." In Morgan, we referred to the alleged defense as "the affirmative defense of insanity," and this Court approved jury instructions that required the defendant to prove "that he was insane due to involuntary intoxication." Id. at 133, 646 S.E.2d at 905. In Johnson v. Commonwealth, 135 Va. 524, 115 S.E. 673 (1923), the Supreme Court acknowledged that a defense can be alleged on the basis of a defendant's involuntary intoxication where the intoxication caused either "frenzy" or "madness." Specifically, the Court in Johnson stated, "If, however, a person by the unskillfulness of his physician, or by the contrivance of his enemies, eat or drink anything which causes *frenzy or madness*, he is entitled to the same exemption from punishment for his acts thereby occasioned

as other madmen." Id. at 533-34, 115 S.E. at 676 (emphasis added) (quoting Davis' Criminal Law 29).

Furthermore, while the Model Jury Instructions in Virginia are certainly not binding precedent, we simply note that the Model Jury Instructions in the Commonwealth on involuntary intoxication and on insanity support our conclusion that an involuntary intoxication defense requires that the defendant prove that he was insane as a result of the involuntary intoxication. The Model Jury Instruction on involuntary intoxication largely parallels the instruction for insanity, except for the distinction that, with involuntary intoxication, the cause of the defendant's inability to "understand the nature, character and consequences of his act or . . . to distinguish right from wrong," comes from his involuntary intoxication – not his mental disease or defect. Compare Model Jury Instrs.—Crim. No. 53.300 (involuntary intoxication), with Model Jury Instrs.—Crim. No. 53.150 (insanity).

In addition, appellant's argument – that the defense of involuntary intoxication is not covered by the rule in Stamper – would, if it were the case, allow a defendant who pleads involuntary intoxication to avoid the statutory pleading requirements. The General Assembly has given the Commonwealth the statutory right to evaluate a defendant's mental state – once the defendant has given notice of intent to place his sanity at issue. The Commonwealth may conduct its own evaluation of the defendant through a different mental health expert appointed by the court, and it may review the report created by the defendant's mental health expert, the results of any "evaluation of the defendant's sanity at the time of the offense," and copies of records "obtained during the course of any such evaluation." See Code §§ 19.2-168, 19.2-168.1, 19.2-169.5. A defendant's failure to properly and timely comply with these statutory requirements could result in the defendant's evidence of his mental state being barred at trial. See Code §§ 19.2-168, 19.2-168.1. These statutory procedures – which are not, as appellant

describes them, a separate "statutory insanity defense" – reflect the principle that "the Commonwealth, like the defendant, is entitled to a fair trial, which includes 'the right to a fair rebuttal of mental health evidence presented by the defendant.'" Grattan v. Commonwealth, 278 Va. 602, 622, 685 S.E.2d 634, 645 (2009) (quoting Muhammad v. Commonwealth, 269 Va. 451, 507, 619 S.E.2d 16, 48 (2005)). Appellant's argument that he should be permitted to present evidence of his mental state because he has labeled his defense as "involuntary intoxication" instead of "insanity" would improperly allow appellant to circumvent these statutory requirements.

In short, involuntary intoxication can be another means to prove insanity if the defendant can satisfy the M'Naghten rule. In other words, involuntary intoxication only negates *mens rea* if the accused can show that he met the legal standard for insanity – that he did not understand the nature, character, and consequences of his act or that he was unable to distinguish right from wrong – at the time he committed the offense. The accused may not put forth expert evidence of his mental state as to his specific intent, pursuant to an involuntary intoxication defense, unless the evidence shows that he passed the legal threshold of insanity due to his involuntary intoxication. Therefore, a defendant who pleads involuntary intoxication in this situation must comply with the statutory requirements for putting on an insanity defense. Involuntary intoxication is not a back-door way for the introduction of expert evidence of a defendant's mental state. This holding is consistent with the common law tradition in the Commonwealth that insanity is proven only by meeting the requirements of the M'Naghten rule, consistent with the Supreme Court's holding in Stamper, and consistent with the statutory procedural requirements set by the General Assembly.

By offering expert evidence of his mental state, but refusing to plead insanity, appellant attempted to avoid the rules that dictate how such evidence must be disclosed. Appellant

essentially wants all the benefits afforded an insanity argument without the associated responsibility for notice to the court required by statute and case law. The trial court was correct in finding that the Supreme Court in Stamper has precluded the use of evidence of a defendant's mental state to negate *mens rea*, unless it arises from an insanity defense. Therefore, the trial court did not err in finding that, under Stamper, appellant's expert evidence related to his mental state and *mens rea* was inadmissible because, although appellant pleaded involuntary intoxication, he did not plead insanity and did not follow the statutory requirements for putting forward an insanity defense.[8]

C. The Trial Court's Finding that Appellant Alleged an Insanity Defense Without the Statutorily Required Notice

In assignment of error VIII, appellant argues that the trial court erred by finding that his involuntary intoxication defense amounted to an insanity defense. He argues that his "medication induced delirium" did not amount to insanity because it resulted from his medication, and it "resolved immediately after the medications were eliminated or neutralized."

---

[8] In addition, appellant's argument that the trial court's reading of Stamper conflicts with existing precedent is easily dismissed. In Fitzgerald v. Commonwealth, the accused was permitted to offer expert testimony on his intoxicated mental state, pursuant to the exception that a defendant, who committed murder while voluntarily intoxicated, may negate his *mens rea* for capital murder without pleading insanity. 223 Va. at 624-25, 292 S.E.2d at 803. This exception applies "when a person voluntarily becomes so intoxicated that he is incapable of deliberation or premeditation, he cannot commit a class of murder that requires proof of a deliberate and premeditated killing." Wright v. Commonwealth, 234 Va. 627, 629, 363 S.E.2d 711, 712 (1988). Because appellant in this case was not charged with premeditated murder, the exception is inapplicable here. Likewise, Pritchett v. Commonwealth, 263 Va. 182, 557 S.E.2d 205 (2002), is also unpersuasive here. In Pritchett, the Supreme Court held that the trial court erred in excluding expert testimony as to the hypothetical effect of the defendant's mental disorder on the reliability of his confession in a police interview – not as to his *mens rea* actually to commit the underlying crime. Id. at 187, 557 S.E.2d at 208. The Court in Pritchett did not consider expert evidence of the defendant's mental state as to his specific intent to commit the crime. Therefore, neither the Supreme Court's holding in Fitzgerald nor in Pritchett contradicts its clear holding in Stamper, and neither is applicable to the case now before us.

Despite the numerous assertions by appellant's counsel that appellant was not pleading an affirmative defense of insanity, appellant's counsel stated during his proffer on May 27, 2016: "this is, in essence, it's a claim of insanity, a claim of temporary insanity."  Counsel for appellant maintained, however, that the defense was not "the insanity defense according to statute."  The prosecutor argued, during the May 27, 2016 hearing, that appellant's defense was premised not on intoxication but on a mental defect from "medication induced delirium."  Appellant noticed his intent to rely on expert testimony regarding a psychiatric evaluation of appellant and certain "predisposing and precipitating factors" like "chronic pain, hypertension, stress, sleep deprivation, drug dependence, history of neurological disease[,] dehydration, and depression" – any combination of which, he argued, could have made appellant more susceptible to the delirium.

Both the proffered evidence and appellant's assertions demonstrate that appellant was attempting to negate *mens rea* by offering expert evidence of his mental state.  Whether appellant's alleged lack of *mens rea* for the charged offenses resulted from the intoxicating substances that he consumed[9] or from a mental defect caused by "predisposing and precipitating factors," his argument here is without merit.  An accused can completely negate the required *mens rea* for the crimes charged by showing that he met the legal standard for insanity. Therefore, the trial court did not err here in concluding that appellant's claim to lack *mens rea* for the offenses, which he tried to prove in part by the admission of evidence of his mental state, was actually an insanity defense.  We need not decide for the purposes of this appeal whether his defense was premised on a mental defect or on involuntary intoxication.  Appellant could have

---

[9] Here, the jury, as factfinder, may well have found appellant's testimony that he was involuntarily intoxicated to be incredible, as appellant took the drugs himself and was using at least one medication – the fentanyl patches – in a dosage twice as high as his prescription allowed.

shown a viable defense to negate *mens rea* by proving insanity, but he failed to do so or even to follow the required statutory procedures that would have allowed him to put on such a defense.

### D.  The Trial Court's Exclusion of Evidence of Appellant's Mental State to Show Unconsciousness and Its Limitation of Psychiatric Testimony

In assignment of error X, appellant argues that "[t]he trial court erred in excluding mental state evidence offered in support of an unconsciousness defense."[10]  In assignment of error IX, appellant argues that "[t]he trial court erred by circumscribing the manner in which the defendant was permitted to prove affirmative defenses, such as by excluding expert evidence, redacting records, and barring the use of certain words."  Appellant acknowledges that a trial court's decision on the admissibility of evidence is reviewed for an abuse of discretion.  See Abney, 51 Va. App. at 345, 657 S.E.2d at 800.

Our Supreme Court has defined "'unconsciousness' as a state of mind of persons of *sound mind* suffering from some voluntary or involuntary agency rendering them unaware of their acts."  Riley v. Commonwealth, 277 Va. 467, 479, 675 S.E.2d 168, 175 (2009) (emphasis added) (quoting Greenfield v. Commonwealth, 214 Va. 710, 714, 204 S.E.2d 414, 417 (1974)).  The trial court here refused to admit evidence relating to appellant's unconsciousness defense because it found that the proposed evidence was essentially an effort to put on an *insanity defense* without calling it such so as to show that appellant lacked the necessary *mens rea* – and that appellant was, therefore, directly prohibited from doing so by Stamper.

---

[10] We note that the Supreme Court in Riley v. Commonwealth, 277 Va. 467, 479 n.9, 675 S.E.2d 168, 175 n.9 (2009) (emphasis added), simply "*assume[d], without deciding*, that unconsciousness is a defense to criminal charges other than just homicide" when it affirmed the convictions for driving while intoxicated and maiming another person as a result of driving while intoxicated.  The Supreme Court has not actually decided that unconsciousness is a defense to criminal charges not involving homicide.

Even assuming without deciding that the trial court erred in excluding this evidence, any error was harmless.[11] Appellant argues that the trial court abused its discretion by essentially rendering the defense of unconsciousness unavailable to Schmuhl. As appellant raises a challenge related to the admissibility of evidence, "[w]e examine this claim under the standard for non-constitutional harmless error." Salahuddin v. Commonwealth, 67 Va. App. 190, 211-12, 795 S.E.2d 472, 483 (2017); see Carter v. Commonwealth, 293 Va. 537, 544-46, 800 S.E.2d 498, 501-02 (2017) (applying a non-constitutional standard to determine that any error was harmless that the trial court committed in refusing to admit certain evidence supporting a defendant's claim of self-defense).

The standard for non-constitutional error is established in Code § 8.01-678, which provides, in pertinent part:

> When it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . [f]or any . . . defect, imperfection, or omission in the record, or for any error committed on the trial.

Error is harmless when we are able to conclude "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." Clay v. Commonwealth, 262 Va. 253, 260, 546 S.E.2d 728, 731-32 (2001) (quoting Kotteakos v. United States, 328 U.S. 750, 764-65 (1946)). "[H]armless error analysis . . . [is not] simply a sufficiency of the evidence analysis." Hooker v. Commonwealth, 14 Va. App. 454, 458, 418 S.E.2d 343, 345 (1992), quoted with approval in Williams v. Commonwealth, 32 Va. App. 395, 400, 528 S.E.2d 166, 169 (2000) (en banc); see

---

[11] Because we find that appellant's arguments that relate to evidence offered in support of his unconsciousness defense are adequately resolved with a harmless error analysis, we decline to consider the issue on the merits, following the principle that "an appellate court decides cases 'on the best and narrowest ground available.'" Luginbyhl v. Commonwealth, 48 Va. App. 58, 64, 628 S.E.2d 74, 77 (2006) (en banc).

<u>Cartera v. Commonwealth</u>, 219 Va. 516, 519, 248 S.E.2d 784, 786 (1978). The appellate court must "examin[e] the excluded evidence in light of the entire record." <u>Commonwealth v. Proffitt</u>, 292 Va. 626, 642, 792 S.E.2d 3, 11 (2016).

The record reflects that appellant was not unconscious during the attack. It shows he planned and completed the home invasion with precision, clarity, and control. Appellant handwrote a shopping list ahead of the attack with the items he needed: "handcuffs, two bottles of Nyquil, two packs of Benadryl, adult diapers (male), two sleeping masks (if available)." Appellant disguised himself, forced his way into the house, and attempted to maintain a fake identity during the entire encounter. Testimony from Fisher and Duncan revealed that appellant did not stumble and did not slur his words during the three hours that he was inside their home. He questioned the couple extensively and demanded information about money that they might keep in the house. He also looked through Fisher's work email – apparently not finding the information for which he searched. Appellant forced the victims to move from room to room throughout the invasion, and he closed window blinds in the house. Appellant shot and stabbed Duncan, he tasered and stabbed Fisher, and he then kicked the already gravely wounded Fisher in the head as he left, telling him, "You're going to die." Evidence showed that appellant attempted to cover up his crimes by recovering the Taser cartridges and gun shell casings and that he doused the foyer rug with gasoline before leaving the home. Appellant used a prepaid phone during the events rather than his personal cell phone, removed his bloody clothing prior to arrest, and soaked the clothing in ammonia as he and his wife fled from the police. Fisher later described appellant's demeanor during the events as "very forceful, authoritative. Very much in control." In addition, testimony from arresting officers showed that appellant was alert when he was first apprehended – and that any change in his level of consciousness took place after he was placed into the police vehicle. Any possible error in not admitting expert evidence of his mental

- 22 -

state at the time of the offenses is simply insignificant in comparison with the overwhelming evidence of appellant's lucidity both before and during the events in question.[12]

In assignment of error IX, appellant argues that the trial court erred by limiting appellant's presentation of evidence in support of his proffered defenses of involuntary intoxication and unconsciousness. The trial court redacted medical records, limited appellant's expert testimony to a discussion of toxicology rather than psychiatry, and would not allow appellant's expert to use certain words like "delirium," "psychosis," "dissociation," and "delusions." Because appellant refused to plead insanity, the trial court did not err in preventing appellant from presenting expert testimony about his mental state. In addition, the trial court has broad discretion in deciding what evidence is relevant and should be admitted at trial. Therefore, we cannot find that it was an abuse of discretion for the trial court to limit the use of certain words and to redact medical records because the trial court did so to prevent appellant from presenting expert evidence of his mental state without first making an insanity defense, as required by statute and by the Supreme Court's holding in Stamper. Furthermore, even assuming without deciding that it was error to exclude any such evidence related to appellant's unconsciousness defense, any error was harmless for the reasons we have stated above.

E. Jury Instructions on Unconsciousness and Intoxication

"The purpose of any jury instruction is to inform the jury of the law guiding their deliberations and verdict." Morgan, 50 Va. App. at 132, 646 S.E.2d at 905 (quoting Keen v.

---

[12] Even if appellant, as he claims, was actually wearing two fentanyl patches at the time of the home invasion that he committed here, these two fentanyl patches were twice his prescribed dosage. The Supreme Court has stated, "Where not self-induced, unconsciousness is a complete defense to a criminal homicide." Riley, 277 Va. at 479, 675 S.E.2d at 175 (quoting Greenfield, 214 Va. at 714, 204 S.E.2d at 417). However, given the extraordinary amount of fentanyl that appellant claims was on him at the time of the offenses (and the fact that the amount far exceeded his prescribed dosage), the defense of unconsciousness would simply not be available to appellant, even if he had been unconscious (which the evidence shows he was not), because any supposed unconsciousness would have been self-induced.

Commonwealth, 24 Va. App. 795, 807, 485 S.E.2d 659, 665 (1997)). "The trial judge has broad discretion in giving or denying instructions requested." Id. at 132-33, 646 S.E.2d at 905 (quoting Gaines v. Commonwealth, 39 Va. App. 562, 568, 574 S.E.2d 775, 778 (2003) (*en banc*)). "A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" Darnell v. Commonwealth, 6 Va. App. 485, 488, 370 S.E.2d 717, 719 (1988) (quoting Swisher v. Swisher, 223 Va. 499, 503, 290 S.E.2d 856, 858 (1982)). "[I]n deciding whether a particular instruction is appropriate, we view the facts in the light most favorable to the proponent of the instruction." Cooper v. Commonwealth, 277 Va. 377, 381, 673 S.E.2d 185, 187 (2009). However, "[n]o instruction should be given that 'incorrectly states the applicable law or which would be confusing or misleading to the jury.'" Morgan, 50 Va. App. at 133, 646 S.E.2d at 905 (quoting Mouberry v. Commonwealth, 39 Va. App. 576, 582, 575 S.E.2d 567, 569 (2003)). "If the principles set forth in a proposed instruction are fully and fairly covered in other instructions that have been granted, a trial court does not abuse its discretion in refusing to grant a repetitious instruction." Joseph v. Commonwealth, 249 Va. 78, 90, 452 S.E.2d 862, 870 (1995).

In his last two assignments of error (assignments of error XI and XII), appellant claims that the trial court erred by denying his requested jury instruction that defined and described "unconsciousness" and his jury instruction that defined "intoxication." Appellant's proposed instruction on unconsciousness stated:

> Unconsciousness refers to a state where a subject physically acts in fact but is not, at the time, conscious of acting. Unconsciousness does not reach the physical dimensions commonly associated with the term (coma, inertia, incapability of locomotion or manual action, and so on) in order to represent a legal defense. If you find that Mr. Schmuhl was physically acting but not conscious of his acts at the time of the offense, you must find him not guilty.

Appellant argues that his defense of unconsciousness was not adequately addressed by the instruction that the court gave on involuntary intoxication, and he claims that he offered more than a "scintilla of evidence" to justify a separate unconsciousness instruction. See Gibson v. Commonwealth, 216 Va. 412, 417, 219 S.E.2d 845, 849 (1975) (stating that jury instructions "must be supported by more than a mere scintilla of evidence").

However, appellant's requested instruction on unconsciousness was an inaccurate statement of the law. For example, it did not indicate that unconsciousness cannot be self-induced by voluntarily taking drugs or medication. See Riley, 277 Va. at 479, 675 S.E.2d at 175. The instruction also failed to state that unconsciousness is caused by "some voluntary or involuntary agency rendering [persons] unaware of their acts." Id. Therefore, the trial court did not err in refusing appellant's requested jury instruction on unconsciousness because it was inaccurate.

Finally, appellant contends that the trial court erred when it refused his instruction that stated, "Legal intoxication means a disturbance of mental or physical capacities resulting from the introduction of substances into the body." The Supreme Court has held that "[t]he phrase 'under the influence of intoxicants' is composed of words of ordinary significance and their meaning is well known to the average juror, but in the absence of statute the phrase is not susceptible of a definite, accurate definition acceptable to all." Gardner v. Commonwealth, 195 Va. 945, 953, 81 S.E.2d 614, 619 (1954). There is neither a model jury instruction nor a statute defining the word "intoxication" in the Commonwealth. Therefore, we cannot say that the trial court abused its discretion in refusing to give an instruction on the definition of "intoxication" and in instead permitting the parties to argue the meaning of "intoxication" before the jury.

III. CONCLUSION

In short, the trial court did not err in excluding the evidence of appellant's mental state pursuant to his involuntary intoxication defense or in circumscribing the manner in which appellant presented his evidence of the effects of the drugs he took. The Commonwealth's common law history as a M'Naghten jurisdiction and the Supreme Court's holding in Stamper prevent evidence of a defendant's mental state from being offered to negate *mens rea* for an involuntary intoxication defense, unless the defendant properly notifies the Court, as required by statute, that his involuntary intoxication caused him to cross the legal threshold to insanity at the time he committed the offense. Furthermore, it was not error for the trial court to find that appellant was actually offering an insanity defense, despite not following the required statutory procedures for doing so under Code §§ 19.2-168, 19.2-168.1, and 19.2-169.5 and despite appellant's protests to the contrary, when appellant intended to rely on expert evidence to show his mental state at the time he committed the charged offenses. In addition, assuming without deciding that it was error to exclude appellant's evidence of his mental state for his unconsciousness defense, any error was harmless given the overwhelming evidence of appellant's guilt and the overwhelming evidence that he was not unconscious when he committed these offenses. It was not error to exclude appellant's proposed jury instruction on "unconsciousness" because the instruction on unconsciousness was an inaccurate statement of the law. Finally, the trial court did not abuse its discretion in excluding appellant's proposed jury instruction on the word "intoxication" (and in simply allowing both counsel to argue the meaning of the word before the jury) because "intoxication" is a word of common usage and there is neither a model jury instruction nor a statute defining the term.

For all of these reasons, we affirm appellant's convictions for two counts of abduction with intent to gain pecuniary benefit, two counts of aggravated malicious wounding, two counts

of using or displaying a firearm during the commission of an aggravated malicious wounding, and burglary while armed with a deadly weapon.

Affirmed.