COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:    Judges Beales, Ortiz and Lorish
Argued by videoconference


CHRISTY ROBERTSON TEMPLE

                                                    MEMORANDUM OPINION* BY
v.        Record No. 1172-21-1                    JUDGE LISA M. LORISH
                                                    OCTOBER 4, 2022

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
A. Bonwill Shockley, Judge

Sarah R. Murphy, Assistant Public Defender, for appellant.

Robin M. Nagel, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Christy Robertson Temple was in crisis.  A neighbor called 911 after hearing Temple

"banging on the wall [of her apartment] screaming help me, help me."  Officers from the Virginia

Beach Police Department found her alone, naked, and screaming in a house that was "trashed."

Temple told the officers many things that did not track with reality—that invisible bugs were biting

her, that her mother was paying them to take her into custody, that a man named Chris conspired to

have her arrested, and that this entire interaction was being posted to Facebook.

At first, Temple agreed to allow Emergency Medical Services (EMS) to check on her, but

then she changed her mind.  At this point, Officer Ward found that the criteria for an emergency

custody order (ECO) had been met, concluding that there was probable cause Temple had a mental

illness, a substantial likelihood that the illness would cause serious physical harm to herself or

_____

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

others, and that she needed hospitalization or treatment but was unable or unwilling to voluntarily get that treatment.

But the story did not end with Temple receiving treatment. Having already refused to be seen by EMS, Temple continued to refuse to be taken for medical care pursuant to the ECO. As two officers tried to forcefully remove her from her apartment, she bit one on the arm and kicked at the other. After she was ultimately placed in wrap restraints, the officers concluded she had committed multiple criminal offenses which superseded the ECO. Therefore, they "dissolved" the ECO and took Temple to jail instead of the hospital. Temple was convicted of two counts of assault and battery of a police officer, in violation of Code § 18.2-57, and one count of obstruction of justice, in violation of Code § 18.2-460, after a bench trial.

Temple argues that the trial court erred in convicting her because her mental health crisis, as evidenced by the ECO, negated the intent necessary to commit the offenses. The Commonwealth asserts that Temple's argument is foreclosed because she failed to follow the procedural requirements in the newly enacted Code § 19.2-271.6, which permits a defendant to offer certain evidence "concerning the defendant's mental condition at the time of the alleged offense." Ultimately, we find the evidence sufficient to sustain all the counts of conviction.

BACKGROUND[1]

Temple's next-door neighbor called 911 and reported that she was banging on the wall and screaming for help. Officer Ward arrived at her apartment to perform a welfare check. He noticed that Temple's door was "cracked slightly open," and he could hear her screaming. With Temple's permission, Ward entered her apartment and found her sitting on the floor, naked and alone. Ward

---

[1] "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Blankenship v. Commonwealth*, 71 Va. App. 608, 615 (2020) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)).

gave her a blanket to cover herself and asked her why she was shouting. Temple responded that she was being bitten all over her body, and it felt like a snake was constricting her around her legs, which was why she was sitting on the floor. Temple was "very elevated in her emotions, very loud," and agitated. She was "[j]ust very emotionally escalated." Ward noticed that silverware was "thrown all around the place," and he saw broken items tossed everywhere—glass vases, plates, "things like that." The apartment was "trashed." Temple had "cut marks and different markings all up and down her arms," and cigarettes were all over the floor, with visible burn marks in the carpet. As a result, Ward asked Temple if she wanted medical attention and then called EMS.

While Temple and Ward waited for EMS to arrive, Officers Hatcher and Grovesteen arrived. The officers already knew Temple, having had "numerous encounters" with her in the past. As the three officers spoke with Temple inside her apartment, she became more agitated and asked them to leave. The officers went outside to wait for EMS. When EMS arrived, Temple first said she did not want to see them, but then she changed her mind. About thirty seconds later, she started screaming at EMS to leave. Ward believed she appeared to be under the influence of narcotics. After speaking with the EMS workers and making further observations of Temple, the officers determined that she met the criteria for an ECO.[2] They asked Temple if she would voluntarily go to the hospital, but she refused. At that point, they "tried to take her into custody" under the ECO.[3]

Hatcher grabbed Temple's arm and told her to stand up. Temple refused. Ward then took her other arm and attempted to raise her, but she leaned her body to the side and fell over to the

_____

[2] The officers testified at trial that they were familiar with the standard for issuing an ECO, which requires probable cause to believe that the subject has a mental illness, that there is a substantial likelihood that the illness will cause serious physical harm to the subject or others, that the subject is in need of hospitalization or treatment, and that the subject is unable or unwilling to voluntarily get that treatment. *See* Code § 37.2-808(A).

[3] While the Virginia Beach Police Department offers advanced crisis intervention training (CIT) and Department policy recommends at least one advanced CIT-trained officer respond in an ECO case, none of the officers involved here were so trained.

ground. Temple was "spinning her body around on the floor" in an effort to ward off the officers and then grabbed onto her entertainment center and maintained her grip. Ward grabbed her hand to bring it over her stomach and told Hatcher to handcuff her quickly in the front of her body. Temple then sat up, "planted her teeth" on his arm and bit Ward. The bite left a bruise but did not break his skin. As they struggled, Temple tried to bite Ward several more times while she kicked and flailed her legs. Ward saw her intentionally kick Hatcher "[p]retty close to his crotch area." While they were trying to restrain Temple, she continued to make statements that did not meet reality—yelling that there were cameras filming everything and posting the interaction on Facebook and that her mother or someone called Chris had paid the officers to arrest her. Throughout the encounter, Temple also repeatedly yelled at the officers to leave, told them she would fight them, and expressed confusion over why they were arresting her. The officers called for backup, and two more police officers and four sheriff's deputies arrived. Ultimately, the officers removed Temple from her apartment in a wrap restraint.[4]

While Temple was handcuffed, in the wrap restraint, and waiting in a squad car, the officers discussed the incident to decide what to do next. Everyone agreed Temple had assaulted Ward by biting him. Hatcher said he had not been assaulted or kicked. For nearly fifteen minutes they debated whether to take her to the hospital under the ECO because that was in place first, or whether the intervening assault allowed them to take her to the jail on the assault charge instead. Ultimately, Ward testified that, because "[c]riminal supersedes mental health in our field," the officers

---

[4] Hatcher testified that a wrap restraint is "essentially a cocoon that you wrap people up in where their hands are tied—or handcuffed behind their back. Their legs are wrapped together. Their body is wrapped together, and they're basically stuck, like, sitting up, and they really can't do anything with their body."

"terminated or dissolved" the "paperless" ECO[5] and Temple "was ultimately taken to jail that day instead of going to the hospital where we were trying to take her."

Temple was ultimately charged with two counts of assault and battery of a police officer based on biting Ward and kicking Hatcher. At trial, Hatcher admitted he previously said Temple had not kicked him, but that in fact, she kicked "directly at [him] to get [him] to try and release the hold" on her. The kick landed "[r]ight on the inside of the upper thigh on [his] left leg." Hatcher explained that he had only later realized Temple kicked him when he found a shoe mark on his pants. Specifically, he said that he could see "some dust, dirt or something to where something came in contact with [his] pants." On cross-examination, Hatcher acknowledged that Temple was not wearing shoes during the incident. Ward also testified that he saw Temple kick Hatcher.

After the Commonwealth concluded its case, Temple moved to strike the evidence, arguing that she did not have the intent necessary to prove the offenses given her mental condition at the time. She also argued that Hatcher's testimony was not credible. The trial court denied the motion to strike and ultimately found her guilty of two counts of assault and battery of a police officer, in violation of Code § 18.2-57, and one count of obstruction of justice, in violation of Code § 18.2-460. Temple noted this appeal.

---

[5] Code § 37.2-808(G) permits

> [a] law-enforcement officer who, based upon his observation or the reliable reports of others, has probable cause to believe that a person meets the criteria for emergency custody as stated in this section may take that person into custody and transport that person to an appropriate location to assess the need for hospitalization or treatment without prior authorization.

The statute is silent as to any ability to "dissolve" a paperless ECO and the officers did not cite to any changed circumstances that defeated their original probable cause determination.

ANALYSIS

Temple argues that there was insufficient evidence to prove she had the requisite intent to commit any of the offenses because she was under an ECO. She also argues that there was insufficient evidence that she battered Officer Hatcher. The Commonwealth responds by arguing that Temple has "procedurally defaulted the issue of her capacity," because "Temple did not follow the statutory procedures and requirements under Code § 19.2-271.6, [and that therefore] Temple's argument regarding her mental condition was not properly before the trial court." Because Temple's intent argument would have been entirely foreclosed by our caselaw before the enactment of Code § 19.2-271.6, we proceed by first examining this new statute. Then we evaluate whether the evidence was sufficient to show that Temple had the requisite intent, considering Code § 19.2-271.6. Finally, we take up Temple's argument that Officer Hatcher's testimony was inherently incredible.

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

I. Code § 19.2-271.6 abrogated the common law rule that a defendant's mental state is immaterial to the issue of intent.

Effective July 1, 2021,[6] Code § 19.2-271.6(B) states, "[E]vidence offered by the defendant concerning the defendant's mental condition at the time of the alleged offense, including expert testimony, is relevant, is not evidence concerning an ultimate issue of fact, and shall be admitted" if it meets two conditions. First, if it "tends to show the defendant did not have the intent required for the offense charged" and second, if it "is otherwise admissible pursuant to the general rules of evidence." *Id.* The statute continues:

> For purposes of this section, to establish the underlying mental condition the defendant must show that his condition existed at the time of the offense and that the condition satisfies the diagnostic criteria for (i) a mental illness, (ii) a developmental disability or intellectual disability, or (iii) autism spectrum disorder as defined in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association.

*Id.*

Before this statute took effect, it was well-settled "that evidence of a criminal defendant's mental state at the time of the offense [was], in the absence of an insanity defense, irrelevant to the issue of guilt." *Stamper v. Commonwealth*, 228 Va. 707, 717 (1985). "[T]he fundamental reason for the exclusion of this evidence rest[ed] on Virginia's adherence, through the *M'Naghten* rule, to the common law's use of a 'stable and constant standard of mental competence as the criterion for the determination of criminal responsibility.'" *Schmuhl v. Commonwealth*, 69 Va. App. 281, 300 (2018) (quoting *Stamper*, 228 Va. at 716), *aff'd*, 298 Va. 131 (2019). "Under the common law and in the Commonwealth, '[a] person whose mental state f[e]ll[] outside the borderline drawn by that standard [wa]s deemed legally insane. All persons inside that borderline [we]re presumed to be

---

[6] "[R]ules of evidence are procedural," so we apply them prospectively at a hearing that occurs after a new law takes effect no matter when the underlying conduct took place. *Wyatt v. Va. Dept. of Soc. Servs.*, 11 Va. App. 225, 229 (1998).

sane, and to possess a sufficient degree of reason to be responsible for [their] crimes.'" *Id.* (first and sixth alterations in original) (quoting *Stamper*, 228 Va. at 717). "The reasoning behind a bright-line rule separating the sane, who are held criminally responsible, and the insane, who are not, is that the 'classifications and gradations applied to mental illnesses, disorders, and defects' are subject to frequent revision." *Id.* (quoting *Stamper*, 228 Va. at 716). Thus, "the only way to negate *mens rea* with evidence of a defendant's mental state [wa]s to plead an insanity defense." *Id.* at 301.

The General Assembly may alter the common law when it chooses to do so. Code § 1-200 ("The common law of England . . . shall continue in full force . . . except as altered by the General Assembly."). We will not find that the common law was "altered or changed by statute unless the legislative intent is plainly manifested," and "[a] statutory change in the common law is limited to that which is expressly stated or necessarily implied" by the statute. *Boyd v. Commonwealth*, 236 Va. 346, 349 (1988). "However, 'where it is apparent that the legislature has made a value judgment with respect to certain behavior, it follows that the legislature intended to abrogate to that extent the common law . . . .'" *Poole v. Commonwealth*, 73 Va. App. 357, 366 (2021) (alteration in original) (quoting *Collins v. Commonwealth*, 57 Va. App. 355, 362 (2010)).

Whereas the common law rule in effect precluded all "evidence of a criminal defendant's mental state at the time of the offense" unless the defendant invoked an insanity defense, Code § 19.2-271.6 now permits the admission of "evidence offered by the defendant concerning the defendant's mental condition at the time of the alleged offense" to "show the defendant did not have

the intent required for the offense charged."[7]  Thus, it is clear the General Assembly intended to

partially abrogate the common law rule that all mental state evidence was inadmissible and

irrelevant to a defendant's intent, unless the defendant pursued a defense of insanity, by allowing

the defendant to present evidence of "the defendant's mental condition" as set out in Code

§ 19.2-271.6.  Therefore, in order to consider evidence of a defendant's mental state a defendant

must either raise an insanity defense, *see Stamper*, 228 Va. at 717, or satisfy the requirements of

Code § 19.2-271.6.  Without Code § 19.2-271.6, Temple's argument—that the evidence was

insufficient to prove her intent—would be foreclosed.  To evaluate her argument under the statute,

we interpret Code § 19.2-271.6 as a matter of first impression.

> II.  Code § 19.2-271.6 does not create an affirmative defense but allows a challenge to
> whether an essential element has been proved.

Code § 19.2-271.6 now makes certain mental health evidence admissible as to the "intent

required for the offense charged" and explains what a defendant must show to "establish the

underlying mental condition."  But to what end?  To evaluate whether the court erred in finding that

Temple had the requisite intent, as she argues here, we must first examine what kind of defense the

statute allows.

In interpreting a statute which contains some exception or qualification on criminal liability,

we must determine whether the language creates an affirmative statutory defense or merely relates

---

[7] Under this statute, for a defendant

> to establish the underlying mental condition the defendant must
> show that his condition existed at the time of the offense and that
> the condition satisfies the diagnostic criteria for (i) a mental illness,
> (ii) a developmental disability or intellectual disability, or
> (iii) autism spectrum disorder as defined in the most recent edition
> of the Diagnostic and Statistical Manual of Mental Disorders of the
> American Psychiatric Association.

Code § 19.2-271.6(B).

to a defendant's ability to dispute whether an essential element has been proved. *See* Ronald J. Bacigal & Corinna Barrett Lain, *Criminal Procedure* § 17:28 (2021-2022 ed.) (contrasting "affirmative defense" with a "case-in-chief defense [which] challenges the prosecution's ability to prove some essential element of the charged offense").

The distinction is significant because where a statute creates an affirmative defense, a defendant typically shoulders a burden of production "to present more than a scintilla of evidence" supporting the defense before the Commonwealth must "shoulder its burden of persuasion— requiring proof sufficient under the reasonable-doubt standard to permit a rational factfinder to reject the defense and to find the defendant guilty." *Myers v. Commonwealth*, 299 Va. 671, 679 (2021); *see Riley v. Commonwealth*, 277 Va. 467, 479 (2009) ("When asserting an affirmative defense, such as insanity, self-defense, or unconsciousness, the burden is on the defendant to present evidence establishing such defense to the satisfaction of the fact finder."). Conversely, where a statute merely permits the defendant to dispute whether the prosecution has proved an essential element, both the burden of production and persuasion remain on the prosecution to prove the requisite intent.

First, we observe that Code § 19.2-271.6 makes certain mental health evidence of a defendant's mental condition admissible and relevant to a defendant's guilt—specifically evidence that "tends to show the defendant did not have the intent required for the offense charged" and evidence that would be "otherwise admissible pursuant to the general rules of evidence." And the statute sets a standard for what a defendant must show to "establish the underlying mental condition." *Id.* To qualify as an underlying mental condition, the defendant must show the condition "satisfie[d] the diagnostic criteria" for a mental illness (defined as a "disorder of thought, mood, perception, or orientation that significantly impairs judgment or capacity to recognize reality"), a developmental or intellectual disability (as defined in Code § 37.2-100), or an autism

spectrum disorder ("as defined in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association"). *Id.*

Relevant to our conclusion that the statute does not provide an affirmative defense, we note that, unlike statutes which carve out certain "exceptions" to criminal liability, the plain language of Code § 19.2-271.6 does not "exempt" individuals with mental health conditions from anything. *Cf. Williams v. Commonwealth*, 57 Va. App. 341, 345 n.1 (2010) (Code § 18.2-250(A) created affirmative defense by excluding from liability where "substance was obtained directly from, or pursuant to, a valid prescription"); *Myers*, 299 Va. at 678-79 (Code § 18.2-308's paragraphs beginning "this section shall not apply" to identified individuals and circumstances set out affirmative defenses); *Tart v. Commonwealth*, 52 Va. App. 272, 278-79 (2008) (Code § 18.2-357's "except for a consideration deemed good and valuable in law" created an affirmative defense). Instead, it permits the introduction of evidence that was previously inadmissible.

Next, we find the nature of intent critical to this analysis. "Intent is the purpose formed in a person's mind and may be, and frequently is, shown by circumstances. It is a state of mind which may be proved by a person's conduct or by his statements." *Holley v. Commonwealth*, 44 Va. App. 228, 234 (2004) (quoting *Haywood v. Commonwealth*, 20 Va. App. 562, 565 (1995)). "[A] person is presumed to intend the immediate, direct, and necessary consequences of his voluntary act." *Id.* (alteration in original) (quoting *Haywood*, 20 Va. App. at 565). "[W]hether the required intent exists is generally a question for the trier of fact." *Id.* (alteration in original) (quoting *Haywood*, 20 Va. App. at 565-66). A broad array of evidence is germane to the question of intent, including "an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct." *Langhorne v. Commonwealth*, 13 Va. App. 97, 102 (1991).

A defendant may also introduce a variety of evidence to negate the intent required for a particular offense. For example, the offense of larceny is "the wrongful or fraudulent taking of

personal goods of some intrinsic value, belonging to another, without his assent, and with the intention to deprive the owner thereof permanently." *Marsh v. Commonwealth*, 57 Va. App. 645, 650 (2011) (quoting *Carter v. Commonwealth*, 280 Va. 100, 104-05 (2010)). As is generally the case, "[t]he element of criminal intent may, and often must, be inferred from the facts and circumstances of the case, including the actions of the defendant and any statements made by him." *Id.* at 651 (quoting *Tarpley v. Commonwealth*, 261 Va. 251, 256 (2001)). "[A]bsent countervailing evidence of intention otherwise, 'the wrongful taking of the property in itself imports the *animus furandi*.' In other words, the very existence of a trespassory taking permits the inference (unless other circumstances negate it) that the taker intended to steal the property." *Id.* (quoting *McEachern v. Commonwealth*, 52 Va. App. 679, 685 (2008)).

But there is a case-in-chief defense available. "One who takes another's property intending at the time he takes it to use it temporarily and then to return it unconditionally within a reasonable time—and having a substantial ability to do so—lacks the intent to steal required for larceny." *Carter*, 280 Va. at 107 (quoting 3 Wayne R. LaFave, *Substantive Criminal Law* § 19.5(b), at 89 (2d ed. 2003)). To show that the party intended to return the property unconditionally, and within a reasonable time, a defendant may present relevant evidence of the same. In *Marsh*, the appellant argued that the evidence had been insufficient to prove he "intended to permanently deprive [the victim] of her property because the transactions were written up as loans, he had made several payments on those loans, none of the loans had gone past their maturity except the ones the police placed a hold on, and he had redeemed some of the items." 57 Va. App. at 652-53. We found that the evidence was sufficient in that case "to support the fact finder's conclusion that Marsh did not have the substantial ability to return the property to [the victim] at the time he took it because of his financial situation." *Id.* at 655.

While larceny is a specific intent offense, case-in-chief defenses are also available for general intent crimes. Rape is a "general-intent crime in which the Commonwealth has no burden of proving a defendant's specific intent." *Velasquez v. Commonwealth*, 276 Va. 326, 329 (2008). The requisite intent "is established upon proof that the accused knowingly and intentionally committed the acts constituting the elements of rape." *Id.* at 330 (citation omitted). Yet a defendant may always assert an alibi defense to a general offense crime like rape, denying "that he was present at the time and place where the crime charged occurred." *Marlowe v. Commonwealth*, 2 Va. App. 619, 624 (1986). Such a defense will only be effective "if the alibi, when considered with the whole evidence, raises a reasonable doubt about the defendant's presence at the crime." *Id.* (citation omitted); *see* Bacigal & Lain, *supra*, § 17:32 (explaining that "alibi is not regarded as an affirmative defense, but as a denial of an essential element of the offense, i.e., presence at the scene of the crime"). The burden remains on the Commonwealth to prove the defendant's guilt beyond a reasonable doubt, with the alibi evidence making up just a part of what the jury considers.

For these reasons we conclude that Code § 19.2-271.6 similarly permits a defendant to argue that she lacked the requisite intent by presenting evidence that she has one of the three specific categories of mental conditions under Code § 19.2-271.6(B) and is not raising an insanity defense under *Stamper* and its progeny. It does not set out an affirmative defense. This interpretation is consistent with the way other states that permit the introduction of similar evidence have interpreted the defense.

> Under the doctrine referred to as partial responsibility, diminished responsibility, diminished capacity, or (somewhat less accurately) partial insanity, recognized in some but not all jurisdictions, evidence concerning the defendant's mental condition is admissible on the question of whether the defendant had the mental state which is an element of the offense with which he is charged.

- 13 -

2 Wayne R. LaFave, *Substantive Criminal Law* § 9.2 (3d ed. 2021); *see, e.g.*, *Jackson v. State*, 160 S.W.3d 568, 573 (Tex. Crim. App. 2005) ("Texas does not recognize diminished capacity as an affirmative defense" but as a "failure-of-proof defense in which the defendant claims that the State failed to prove that the defendant had the required state of mind at the time of the offense."); *Commonwealth v. Newton N.*, 89 N.E.3d 1159, 1164 (Mass. 2018) ("Mental impairment, often characterized as diminished capacity, is not an affirmative defense. Rather, [it] 'is merely an application of the ordinary rules of law pertaining to the requisite mental state for conviction of a particular crime charged.'" (quoting *Commonwealth v. Mazza*, 313 N.E.2d 875, 878 (Mass. 1974)) (other citations omitted)); *United States v. Pohlot*, 827 F.2d 889 (3d Cir. 1987) (noting the doctrine was essentially a rule of evidence).

Thus, to counter the Commonwealth's evidence of intent, a defendant may present evidence that she did not possess the requisite intent. To be admissible, the evidence must be relevant to establishing the existence of an underlying mental condition that "satisfies the diagnostic criteria for (i) a mental illness, (ii) a developmental disability or intellectual disability, or (iii) autism spectrum disorder as defined in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association." Code § 19.2-271.6(B). And the evidence must be otherwise admissible under the rules of evidence. *Id.* One subsection begins, "If a defendant intends to introduce evidence pursuant to this section," while the next begins, "If the defendant intends to introduce expert testimony pursuant to this section." *Id.* From this, we readily conclude that both expert and non-expert testimony may be introduced as to a defendant's mental condition.

Finally, we observe that in setting out the potential mental conditions to which evidence must relate, the statute identifies only one condition with specificity: "autism spectrum disorder as defined in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders of

the American Psychiatric Association." *Id.* Otherwise, the statute permits the admission of

evidence relevant to whether a defendant has a "mental illness," defined as "a disorder of thought,

mood, perception, or orientation that significantly impairs judgment or capacity to recognize

reality," or a "developmental disability or intellectual disability," relying on definitions from Code

§ 37.2-100. Code § 19.2-271.6(A). Neither definition identifies specific conditions.[8] *See Schmuhl,*

69 Va. App. at 300 (observing that "'classifications and gradations applied to mental illnesses,

disorders, and defects' are subject to frequent revision" (quoting *Stamper*, 228 Va. at 716)). From

---

[8]     "Developmental disability" means a severe, chronic disability of
an individual that (i) is attributable to a mental or physical
impairment, or a combination of mental and physical impairments,
other than a sole diagnosis of mental illness; (ii) is manifested
before the individual reaches 22 years of age; (iii) is likely to
continue indefinitely; (iv) results in substantial functional
limitations in three or more of the following areas of major life
activity: self-care, receptive and expressive language, learning,
mobility, self-direction, capacity for independent living, or
economic self-sufficiency; and (v) reflects the individual's need for
a combination and sequence of special interdisciplinary or generic
services, individualized supports, or other forms of assistance that
are of lifelong or extended duration and are individually planned
and coordinated. An individual from birth to age nine, inclusive,
who has a substantial developmental delay or specific congenital
or acquired condition may be considered to have a developmental
disability without meeting three or more of the criteria described in
clauses (i) through (v) if the individual, without services and
supports, has a high probability of meeting those criteria later in
life.

Code § 37.2-100.

     "Intellectual disability" means a disability, originating before the
age of 18 years, characterized concurrently by (i) significant
subaverage intellectual functioning as demonstrated by
performance on a standardized measure of intellectual functioning,
administered in conformity with accepted professional practice,
that is at least two standard deviations below the mean and
(ii) significant limitations in adaptive behavior as expressed in
conceptual, social, and practical adaptive skills.

*Id.*

- 15 -

this, we conclude that the statute contemplates the admission of a wide berth of potential evidence relevant to whether a defendant has a qualifying mental condition and whether that condition tends to "show the defendant did not have the intent required for the offense charged." Code § 19.2-271.6.

      III. At this bench trial, the court properly considered the evidence before it and concluded the Commonwealth proved Temple had the requisite intent.

Having construed the statute, we now return to the Commonwealth's argument that Temple failed to follow the procedural requirements of Code § 19.2-271.6 to introduce mental health evidence below and is thus unable to rely on the statute in this appeal.[9] We conclude any such error would be harmless because we find the trial court properly weighed the evidence before it under Code § 19.2-271.6 and concluded that Temple had the requisite intent. *See Clay v. Commonwealth*, 262 Va. 253, 260 (2001) (applying harmless error test based on Code § 8.01-678).[10]

---

[9] In arguing that she lacked the requisite intent, Temple never argued in the trial court that Code § 19.2-271.6 applied to her case, nor has she made that argument to this Court. In fact, in her reply brief, she specifically stated that the statute does not apply to the evidence in this case regarding her mental state. She stated:

> Va. Code § 19.2-271 deals only with evidence regarding a mental condition that satisfies the diagnostic criteria for (i) a mental illness, (ii) a developmental disability or intellectual disability, or (iii) autism spectrum disorder. This code section controls only evidence limited to those conditions. This code section does not exclude other ways to present evidence against the Commonwealth's duty to prove specific intent; rather, it expands what kind of evidence can come in to show a defendant's mental condition, but only in certain contexts. *None of those contexts were at play in Appellant's case.*

(Emphasis added). Because the application of Code § 19.2-271.6 is a question of law, and we do not permit litigants to "define Virginia law by their concessions," *Daily Press, Inc. v. Commonwealth*, 285 Va. 447, 454 n.6 (2013), we address the evidence under Code § 19.2-271.6 because it was effective at the time of trial.

[10] As much as the Commonwealth is now objecting, for the first time, to the trial court's admission of the evidence, such an argument would be waived in any event. *See Saunders v.*

Turning to the sufficiency of the evidence, Temple was convicted of two different offenses. Obstruction of justice requires that a defendant "without just cause knowingly obstruct[] . . . any law-enforcement officer . . . in the performance of his duties." Code § 18.2-460(A). It is the "intent to impede a police officer in the performance of his duties that is the gravamen of [Code § 18.2-460(A)]." *Woodson v. Commonwealth*, 14 Va. App. 787, 795 (1992). Assault on a law enforcement officer likewise requires "an assault or an assault and battery against another knowing or having reason to know that such other person is . . . a law-enforcement officer." Code § 18.2-57(C). In addition, to be a criminal assault, an "overt act must have been committed with the *actual 'inten[t]* to inflict bodily harm.'" *Clark v. Commonwealth*, 54 Va. App. 120, 129 (2009).

Temple argues that the ECO is determinative here and that once the officers determined under Code § 37.2-808[11] that there was probable cause to believe Temple had a mental illness that may lead to imminent harm to herself, or others, she could not have specifically intended to commit

---

*Commonwealth*, 211 Va. 399, 400 (1970) (evidentiary error cannot be considered on appeal "unless proper and timely objection is taken thereto and the grounds of objection are stated with reasonable certainty").

[11]     Any magistrate shall issue, upon the sworn petition of any responsible person, treating physician, or upon his own motion, or a court may issue pursuant to § 19.2-271.6, an emergency custody order when he has probable cause to believe that any person (i) has a mental illness and that there exists a substantial likelihood that, as a result of mental illness, the person will, in the near future, (a) cause serious physical harm to himself or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any, or (b) suffer serious harm due to his lack of capacity to protect himself from harm or to provide for his basic human needs, (ii) is in need of hospitalization or treatment, and (iii) is unwilling to volunteer or incapable of volunteering for hospitalization or treatment.

Code § 37.2-808(A).

- 17 -

the obstruction or assault offenses.[12]  Because Code § 19.2-271.6 does not set out an affirmative defense, the Commonwealth had the burden of both production and persuasion in showing that Temple had the requisite intent for each offense, and the factfinder was entitled to make that determination after weighing all the evidence presented.  The issuance of an ECO, along with the condition of Temple's apartment and her irrational statements and actions, collectively constituted evidence that may be relevant as to whether she had a mental illness when offered under Code § 19.2-271.6—although, in this case, Temple herself emphasized that this statute was not applicable to the evidence here of her mental state.  But the factfinder was able to weigh this against other evidence that suggested Temple intended her actions.

Given our standard of review, we must affirm if "any rational trier of fact could have found" Temple had the necessary intent, *Ingram*, 74 Va. App. at 76 (quoting *Yoder*, 298 Va. at 182), "even if [our] opinion might differ from the conclusions reached by the finder of fact at the trial," *McGowan*, 72 Va. App. at 521 (quoting *Chavez*, 69 Va. App. at 161).  Here, there is some evidentiary support for the trial court's conclusion that Temple had the requisite intent for all three offenses.  Temple knew that the officers were police officers, as she repeatedly said that they were arresting her and questioned why they were arresting her.  Temple had the presence of mind to request permission to call her mother prior to being removed from her apartment, and the officers allowed her to do so.  She bit Ward, and kicked at Hatcher, while repeatedly saying, "I'll fight you," and yelling at them to leave her home.  We cannot say the trial court was without evidence to support its determination that Temple had the necessary intent.

---

[12] If Temple argues that the issuance of an ECO alone establishes that a person under the ECO can never have the requisite intent for any criminal action, we disagree.  Probable cause to believe a person is acting under any mental illness or incapacity does not by itself prove that a person could not form the intent to commit a criminal offense.

Finally, Temple argues that the evidence was insufficient to prove the assault and battery charge premised on her kicking Officer Hatcher, because Hatcher's testimony was unworthy of belief. The factfinder has "[t]he sole responsibility to determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from proven facts lies with the fact finder." *Ragland v. Commonwealth*, 67 Va. App. 519, 529-30 (2017) (citing *Commonwealth v. McNeal*, 282 Va. 16, 22 (2011)). Any potential inconsistencies in the testimony of the witnesses are resolved by the fact finder. *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011) ("We do not revisit such conflicts on appeal 'unless "the evidence is such that reasonable [persons], after weighing the evidence and drawing all just inferences therefrom, could reach but one conclusion."'" (alteration in original) (quoting *Molina v. Commonwealth*, 47 Va. App. 338, 369, *aff'd*, 272 Va. 666 (2006))).

Right after Temple was placed in the wrap restraints, Hatcher said that she had not kicked him in the process. Only later, after finding a shoe print, or some dust or dirt on his pants, did Hatcher remember that she had in fact kicked him. And Hatcher admitted on cross-examination that Temple was not wearing any shoes. But this inconsistent recollection was not the only evidence before the court. Ward testified that he saw Temple kick Hatcher very close to his groin. If believed, Ward's testimony, standing alone and unchallenged, sufficiently established the battery. Given this corroboration, Hatcher's testimony is not unbelievable as a matter of law. "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)). Thus, we do not disturb the trial court's finding that the evidence was sufficient to prove Temple committed an assault and battery upon Hatcher.

## CONCLUSION

For all these reasons, we affirm the convictions.

*Affirmed.*

Ortiz, J., concurring in the judgment.

I join in the Court's decision in this case and its thorough analysis of Code § 19.2-271.6. A trial court's finding of fact "is binding on appeal unless plainly wrong." *Archer v. Commonwealth*, 26 Va. App. 1, 13 (1997). While this deferential standard of review compels an affirmance of Temple's convictions, I write separately to address the failure of our community to properly respond to the mental health crisis, and the officers' hasty decision to take Temple to jail instead of the hospital.

This matter began with Temple's request for help amid a mental health crisis and concluded with her receiving two felony convictions and six months of incarceration. The officers found Temple alone in an apartment that "appeared to be trashed," with cigarettes, broken glass, and other items "tossed everywhere." Temple was naked and had "cut marks and different markings all up and down her arms." She was sitting on the floor, complaining that "something in the carpet is making [her] paralyzed" and that there was a "snake around [her] ankles" and asking to be helped up. She continued to make inconsistent and delusional statements throughout the encounter. The officers originally concluded that Temple was "homicidal, suicidal or unable to care for [her]self" and issued an ECO. After an hour-long interaction, which included Temple's resistance to the ECO by biting one officer and kicking another, the officers secured her into custody using a "slap" jacket. Then, while she waited in the police car, constrained by the slap jacket, the officers debated for over fifteen minutes, referring repeatedly to some principle that "[c]riminal supersedes mental health," and "dissolved" the ECO. Despite Temple's pleas for assistance and obvious need for treatment, she found herself in jail instead of the hospital based on two assault charges.

Under Code § 37.2-808(G), when there is "probable cause to believe that a person meets the criteria for emergency custody," a law-enforcement officer "may take that person into

- 21 -

custody *and transport that person to an appropriate location to assess the need for hospitalization or treatment* without prior authorization." (Emphasis added). The statute explicitly provides that "[s]uch evaluation shall be conducted immediately." *Id.* As the Court points out, the officers in this case "did not cite to any changed circumstances that defeated their original probable cause determination." *Supra* n.5. Throughout their interaction with Temple, the officers had repeatedly told her that she needed mental health treatment and was taken into custody to achieve this goal.[13] However, rather than bringing Temple to the hospital immediately for evaluation, they debated for over fifteen minutes and decided that the criminal charges trumped the need for mental health care. The officers exercised their power under Code § 37.2-808(G) without performing their mandated duty to have her evaluated under the same statute.

The current mental health crisis, combined with a shortage of state psychiatric resources, imposes a burdensome duty on law enforcement. *See, e.g.*, Colby Johnson, *Law Enforcement Continues to Have Problems with ECOs*, WHSV, Feb. 23, 2022, https://www.whsv.com/2022/02/24/law-enforcement-continues-have-problems-with-ecos/. *See also* S.B. 202 (2022) (ordering a study on alternative custody arrangements for individuals under ECOs and temporary detention orders). However, bypassing the medical evaluation required by Code § 37.2-808(G) and sending individuals directly to jail defeats the goal of the ECO statutory scheme. While I join the Court's decision, partly because Temple does not challenge the "dissolution" of the so-called "paperless ECO," I write to caution against the tendency to allow

---

[13] In enforcing the ECO, the officer stated to Temple, "We are going to give you help" and "You are going to the hospital with us."

potential criminal charges to "supersede" the obvious need for mental health care and use jails as an alternative for hospitals.[14]

Furthermore, by failing to comply with Code § 37.2-808(G), the officers not only prevented Temple from receiving timely assistance, but also bypassed an opportunity to generate more direct evidence as to Temple's mental state at the time. The officers were under no urgency to charge Temple with the offenses, as she was already in custody. Had the officers brought Temple to the hospital, as is required by Code § 37.2-808(G), a medical evaluation would have generated more direct evidence for the trial court to rely on in determining Temple's mental state at the time of the offenses.

Unfortunately, neither Code § 37.2-808 nor any other statute provides a remedy for law enforcement officers' failure to perform their duty under Code § 37.2-808(G). While I join the Court's decision because the trial court has broad discretion in weighing existing evidence, I am skeptical that the officers' actions complied with Code § 37.2-808(G) when no change of circumstances negated the initial probable cause that supported the ECO. In the absence of a statutory remedy, the convictions must stand.

---

[14] *See, e.g.*, E. Fuller Torrey, Aaron D. Kennard, Don Eslinger, Richard Lamb & James Pavle, *More Mentally Ill Persons Are in Jails and Prisons Than Hospitals: A Survey of the States*, TREATMENT ADVOC. CTR. 2 (May 2010), https://www.treatmentadvocacycenter.org/storage/documents/final_jails_v_hospitals_study.pdf ("Jails and prisons are not created to be *de facto* mental hospitals.").