PUBLISHED

## VIRGINIA:

*In the Court of Appeals of Virginia on* **Tuesday** *the* **27th** *day of* **May, 2025**.

John Arthur Livesay, Petitioner,

against      Record No. 1141-23-2

Commonwealth of Virginia, Respondent.

Upon a Petition for a Writ of Actual Innocence

Before Judges O'Brien, Raphael, and Lorish

In January 1998, John Arthur Livesay entered an *Alford*[1] plea for first-degree murder and for using a firearm in committing that murder. He was sentenced to 53 years of incarceration. In 2023, Livesay petitioned, *pro se*, for a writ of actual innocence based on non-biological evidence. *See* Code §§ 19.2-327.10 to -327.14. Livesay was taking Effexor and Xanax at the time of the killing. He contends that advancements in scientific research about the increased risk of suicidal thoughts and impulses arising from the combination of those medications make it such that no rational juror would have found him guilty of first-degree murder. *See* Code § 19.2-327.11(A)(vii). While Livesay has presented new evidence in the form of an expert report and scientific research that would have no doubt been relevant at his trial, he has not shown that every rational factfinder would find him not guilty of first-degree murder based on a defense of legal insanity caused by involuntary intoxication or that his intoxication negated the element of premeditation. Thus, we dismiss his petition.

---

[1] A defendant entering an *Alford* plea does not admit guilt but acknowledges that the prosecution has enough evidence of guilt to support a conviction. *North Carolina v. Alford*, 400 U.S. 25 (1970).

BACKGROUND

*Livesay Kills Cindy English*

Livesay and Cindy English had a romantic relationship. One afternoon, Livesay entered the jewelry store at Southpark Mall where English worked, they argued, and Livesay left.

English later left work with her co-worker, Gloria Weidman. They met Weidman's husband outside the store and walked together to their cars in the mall parking lot. As English struggled to unlock her car door,[2] Livesay approached and demanded to speak with her. Livesay and English "struggle[d]," and English told Livesay to "leave me alone, leave me the fuck alone." The Weidmans both heard a "pop" and saw Livesay "standing over" English. Livesay then tucked a firearm into his coat pocket, ran to his vehicle, and sped away.

Five other bystanders—none of whom knew Livesay or English—saw Livesay push English to the ground, stand over her, and shoot her in the head. One of the bystanders would have testified that "after shooting" English, Livesay "stepped to the side," "held the gun over her," and "attempted to . . . shoot her again."[3] A second witness would have testified that, after Livesay shot English, he saw Livesay "working . . . the slide mechanism on the weapon." A third bystander, using his own car, pursued Livesay's vehicle after the shooting. When the witness's vehicle came head-to-head with Livesay's, Livesay pointed the firearm at him through the windshield. Livesay then "backed his vehicle up and drove away."

English died as emergency responders were transporting her to the hospital. The autopsy confirmed the cause of death was a single gunshot wound to the head.

After fleeing the mall, Livesay "dr[ove] around" for about three hours before going to the police station's parking lot. After a stand-off and extensive negotiations,[4] officers arrested Livesay and recovered a

---

[2] Livesay had inserted a toothpick in English's car door to disable the lock.

[3] Police officers found a "cartridge at the scene that apparently misfired out of the gun."

[4] "At one point" during the stand-off, Livesay asked the officers "to shoot him." He also took "some medication" from a pill bottle.

9-millimeter, .380 caliber semiautomatic pistol.[5]  The next day, Sergeant Faries interviewed Livesay while Livesay was in protective custody at the hospital.  Livesay claimed that the shooting was "an accident."  He told Sergeant Faries that English had "shut him out" for more than a month, so he went to the mall to persuade *her* to shoot *him*.  Livesay claimed that he grabbed English's arm when she "tried to get away" and that as she "pulled away," she fell to the ground and the "gun went off."  Livesay explained that "he ran because he knew she was dead because it was a head shot with a .380 hollow point bullet that was meant for him."

*Livesay is Indicted and Enters* Alford *Pleas*

Livesay was indicted for first-degree murder and use of a firearm to commit that murder.  The circuit court ordered both a competency evaluation under Code § 19.2-169.1 and a sanity evaluation under Code § 19.2-169.5.  Forensic psychiatrist Miller Ryans opined that Livesay was competent to stand trial but noted that his "expression and mood throughout all interviews [were] consistent with an individual undergoing major depression, to the level of suicidality."[6]

Livesay entered his *Alford* pleas in January 1998.  During the plea colloquy, Livesay acknowledged that he had discussed the charges, their elements, and possible defenses with his attorney.  "After that discussion," Livesay decided to enter *Alford* pleas because "the Commonwealth ha[d] sufficient evidence" to prove his guilt beyond a reasonable doubt.  The circuit court accepted Livesay's pleas after finding that he had entered them freely and voluntarily.

By agreement of the parties, the Commonwealth called Detective Michael Elmore of the Colonial Heights Police Department to summarize the evidence the Commonwealth would have presented had the case gone to trial, and Elmore testified to the facts summarized above.

---

[5] Forensic analysis established that a cartridge case found at the scene was fired from Livesay's firearm; the .380 caliber auto bullet jacket removed from English's brain during the autopsy was not suitable for comparison.

[6] Livesay's defense counsel received the report assessing Livesay's sanity at the time of the offenses. *See* Code § 19.2-169.5(D).

*Livesay Presents Mental Health Evidence in Mitigation at Sentencing*

At the sentencing hearing, Livesay presented extensive mitigation evidence. Defense counsel argued that at the time of the murder, Livesay was "suffering from a substantial clinical depression." Counsel conceded that "the evidence of the mental illness [did] not reach the level of insanity" because Livesay knew the difference between right and wrong. But "the voice of reason," he argued, had been "reduced to a whisper."

Several physicians and counselors who had treated Livesay testified regarding his mental health leading up to and following English's death. Livesay's family doctor, Phillip Shou, testified that when he saw Livesay in January 1997, he appeared "anxious" and "depressed," but denied that he was suicidal. Dr. Shou prescribed a low dosage of Xanax for anxiety and Busbar for depression.

Mental health counselor Jacqueline Pollard testified that she saw Livesay six times before the killing, beginning in late January 1997. Livesay told her he felt "abused" by the "on/off quality" of his relationship with English. Pollard diagnosed Livesay with anxiety and "adjustment disorder with depressed mood" and referred him to psychiatrist William Yetter for medication management.

Dr. Yetter had two appointments with Livesay before the shooting, during which he presented as having depression, anxiety, low self-esteem, and low self-worth. Livesay "was feeling very down on himself that he was not able to maintain" his relationship with English. Dr. Yetter prescribed Livesay a "low" dose of Effexor to treat his depression because it was a "more powerful antidepressant" than Busbar and had a "favorable side effect profile." Dr. Yetter also hoped that Effexor would help "get [Livesay] off of Xanax" while mitigating any withdrawal effects. Dr. Yetter added that, for some individuals, Effexor could "start to work" within ten days, but that it could sometimes take three to four weeks.

Forensic psychiatrist Pogos Voskanian testified that he began treating Livesay at Central State Hospital in July 1997, several months after the shooting. Livesay was "not responding" to the medications

that another doctor had prescribed,[7] so Dr. Voskanian "changed the medication to Effexor," eventually increasing the dosage to over 200 milligrams a day. Dr. Voskanian described the side effects of Effexor as "increased levels of anxiety, sleeplessness, [and] nervousness." He contended that Livesay had demonstrated a "good deal of improvement" "[w]ithin a couple of weeks" of taking Effexor.

Additionally, Dr. Kenneth Brasfield, an expert in psychopharmacology, reviewed "the medical records regarding Dr. Yetter's provision of Effexor and other medications" to Livesay. He described the "standard of practice" for prescribing Effexor[8] and noted that Effexor's manufacturers recommended that a patient "be maintained at a dosage of 200 milligrams a day for a minimum of [6] weeks in order to see a difference between active medication and placebo." Having reviewed Livesay's medical records, Dr. Brasfield opined that he had not reached a "therapeutic dosage"[9] of Effexor before the shooting.

The Commonwealth asked the circuit court to impose a life sentence. It argued that Livesay was a "self-centered, narcissistic" man who murdered English in cold blood because he could not accept her decision to end their relationship. It noted that Livesay armed himself when he went to the mall parking lot and inserted a toothpick in English's car door to disable the lock. The Commonwealth also emphasized that the proffered eyewitness testimony belied Livesay's claim that the shooting was accidental. Rather, that evidence showed "a calculated, deliberate effort" to kill English.

---

[7] Dr. Ryans saw Livesay on March 10, 1997, after Livesay attempted suicide while in custody. Dr. Ryans diagnosed Livesay with "major, severe depression" and opined that his depression was a "major factor" in his "loss of behavioral control." Dr. Ryans prescribed Zoloft and Trazodone to treat Livesay's depression.

[8] According to Dr. Brasfield, the standard of practice was "to start off with 37 and a half milligrams twice a day and then in about four days" increase to "75 milligrams twice a day." Then the doctor could "leave it at 75 milligrams twice a day for a while and see if there is any improvement," or "go up to" 200 milligrams a day.

[9] Dr. Brasfield defined a therapeutic dosage as one "that shows that it's capable of decreasing" the patient's "primary symptoms."

Livesay requested a sentence "substantially below" the discretionary sentencing guidelines[10] that "recognize[d] the impact of the mental health issues in his behavior." Defense counsel argued that Livesay had "acknowledge[d] that what he did was out of rage[,] [a] sudden rage that he could no longer control the person that he loved more than anyone." He wanted English "to kill him," but when she refused, "[t]he rage erupted in him like a volcano and he shot her." Defense counsel also argued that Livesay did not "get the right medication," because he had not received a therapeutic dose of Effexor before the shooting. The defense maintained that "this crime probably would not have . . . occurred" but for Livesay's mental illness and that "while [Livesay's] ability to tell the right from wrong . . . was not completely absent, . . . it was clearly diminished."

In allocution, Livesay "accept[ed] full responsibility for taking [English's] life," but reiterated that he "never intended" to kill her. Recognizing that his actions were "horrific," he begged the circuit court for mercy. The circuit court sentenced Livesay to 50 years for first-degree murder and 3 years for use of a firearm in the commission of murder.[11]

*Livesay Files a Petition for a Writ of Actual Innocence*

Livesay asserts that he is innocent of first-degree murder.[12] In his *pro se* petition, he argues that "the evolution of the general medical consensus" and "the new medical evidence combined with" FDA "findings"

---

[10] The discretionary sentencing guidelines range was 23 years and 2 months to 38 years and 7 months, with a midpoint of 30 years and 10 months.

[11] This Court denied Livesay's petition for appeal. *Livesay v. Commonwealth*, No. 0439-98-2 (Va. Ct. App. Oct. 26, 1998) (order). In 2014, Livesay, by counsel, filed a "Motion to Vacate/Set Aside" in the circuit court. He asserted that his convictions were void under Code § 8.01-428(D) due to "extrinsic fraud." Specifically, he argued that the manufacturer of Effexor had committed a fraud on the circuit court by failing to disclose that Effexor's side effects included "homicidal ideations and suicidality." He claimed that had defense counsel known this information, counsel could have asserted the defenses of diminished capacity, temporary insanity, or involuntary intoxication. After a hearing, the circuit court denied the motion to vacate. The Supreme Court of Virginia refused Livesay's petition for appeal and denied a petition for rehearing. *Livesay v. Commonwealth*, No. 161065 (Va. Jan. 30, 2017) (refusal order); (Va. Mar. 24, 2017) (rehearing order).

[12] Livesay does not separately challenge his conviction for use of a firearm in the commission of a felony.

establish that "[a]bsent the combined use of Effexor and Xanax, it is not likely" that he "would have shot and killed" English. He claims that "while under the influence of Xanax and Effexor," he decided that "if the relationship could not continue," he wanted English to kill him. "During the course of events in meeting with" English, "there was a struggle in which [she] refused to take the gun, the gun discharged, and [she] was killed." Livesay argues that his prescribed medications induced "an 'involuntary drunken state,' in which [he] could not possess the faculties to commit premeditated murder in the first degree."

In support of his claim of innocence, he proffers a 2016 consultation report from psychiatrist Benjamin Carey. Dr. Carey's report explains that he reviewed the plea colloquy and sentencing hearing transcripts; most of the 49-page report consists of Dr. Carey's summary of those hearings. Dr. Carey stated that "knowledge of" Effexor and Xanax within the medical community has "changed significantly" since January 1998. Psychiatrists now recognize "the potential for increasing suicidality when using antidepressants, particularly in younger males." In 1998, "the knowledge base of the potential for suicidality occurring with antidepressants simply was not appreciated." Dr. Carey opined that "[a]bsent the combined use of Effexor and Xanax, it is not likely that . . . Livesay would have shot and killed" English.

Livesay also proffers a March 2004 FDA Public Health Advisory entitled "Worsening Depression and Suicidality in Patients Being Treated with Antidepressant Medications." The FDA advisory asked manufacturers of several antidepressant drugs, including Effexor, "to include in their labeling a Warning statement that recommends close observation of adult and pediatric patients . . . for worsening depression or the emergence of suicidality." Livesay proffers several other documents, including FDA communications, articles, an expert opinion rendered in an unrelated federal civil case, and a transcript of a psychiatrist's 2010 testimony before the House Veterans Affairs Committee regarding the relationship between psychiatric medication and veteran suicide.

After reviewing his petition, this Court directed the Attorney General to file a response on behalf of the Commonwealth. *See* Code § 19.2-327.11(C). In that response, the Attorney General asserts that Livesay is not entitled to relief and asks the Court to dismiss the petition. Although the Attorney General

- 7 -

acknowledges that "most of Livesay's proffered evidence is newly discovered" under the actual innocence statutes, *see* Code § 19.2-327.11(A)(iv)(a), (vi)(a), he argues that it is not material and does not establish that no rational trier of fact would have convicted Livesay of first-degree murder. *See* Code § 19.2-327.11(A)(vii). Finally, the Attorney General contends that Livesay's proffered evidence is cumulative and collateral. *See* Code § 19.2-327.11(A)(viii). In support of his response, the Attorney General proffers additional evidence that it argues supports premeditation in this case, including that Livesay told his ex-wife "some time" before the shooting that "he would hurt [English] if he found out that she was seeing another man."[13]

Livesay asserts in his reply, filed by counsel,[14] that, "[b]ecause the risks of Effexor were not understood" when he entered his *Alford* plea, "it was impossible . . . to identify the dangers of the interaction between Effexor and Xanax, another medication he had been prescribed." Thus, while trial counsel "was well aware" of Livesay's "mental health crisis generally in the time leading up to the killing, . . . there was no legally cognizable defense available to contest" the charge of first-degree murder. According to Livesay, Dr. Carey's report furnishes this Court with "an expert professional opinion" that "radically changes issues of causality and responsibility in this case."

Livesay contends that "[n]o rational trier of fact would have rejected [his] defense of involuntary intoxication because the evidence best supports a finding that he was unknowingly made intoxicated by an error of his physician" that "so unsettled his reason that he did not understand the nature, character, and

---

[13] This additional evidence included the police report and supplements which contained summaries of the eyewitness accounts that Detective Elmore provided under oath at the plea hearing as well as a summary of an audio-recorded interview between Detectives Early and Moore and Livesay's ex-wife. Approximately a week before the murder, Livesay spoke of "killing himself" because he "could not live without" English. Livesay went to his ex-wife's house on the afternoon of the shooting; he stated, "I'm going to have to leave tonight," and "[y]ou know I am going to die tonight." Shortly after the murder, Livesay called his ex-wife from his car phone and told her that English "was dead. I shot her outside the mall."

[14] This Court appointed counsel in this case when it directed the Attorney General to file a response.

consequences of his act." He asks that this Court either issue the writ or remand the case to the circuit court for an evidentiary hearing under Code § 19.2-327.12.

ANALYSIS

This Court has jurisdiction "over petitions for actual innocence based on non-biological evidence." *Grimm v. Commonwealth*, 81 Va. App. 74, 94 (2024); *see* Code §§ 19.2-327.10 and -327.11(A). To obtain a writ of actual innocence, the petitioner must present new, material evidence establishing that no rational factfinder "would have found proof of guilt . . . beyond a reasonable doubt." *Grimm*, 81 Va. App. at 93 (alteration in original) (quoting *Parson v. Commonwealth*, 74 Va. App. 428, 441 (2022)); *see* Code § 19.2-327.11(A)(vii). We are required to begin with the presumption that the petitioner's convictions are correct and that he is guilty. *See Tyler v. Commonwealth*, 73 Va. App. 445, 459 (2021). A petition must then prove "all of the allegations contained in clauses (iv) through (viii) of subsection A of 19.2-327.11." *Id.* at 463. The failure to satisfy any one of the statutory elements requires us to dismiss the petition. *See id.*

In addition to proving that his proffered evidence "was previously unknown or unavailable" and could not "have been discovered or obtained" before his conviction through "the exercise of diligence," Livesay must prove that the evidence is "material and, when considered with all of the other evidence in the current record, will prove that no rational trier of fact would have found proof of guilt . . . beyond a reasonable doubt." Code § 19.2-327.11(A)(iv), (vi), (vii). Here, while the Attorney General objects to our consideration of much of Livesay's proffered evidence for evidentiary reasons, he generally agrees that the evidence Livesay relies on is new, so we focus on whether Livesay has proved that "*every* rational finder of fact would have" acquitted him based on the proffered evidence. *Tyler*, 73 Va. App. at 469.

We start by "assess[ing] the evidence and proffers individually under Code § 19.2-327.11(A), and then consider the totality of the evidence [the petitioner] has presented in support of his claim of innocence." *Knight v. Commonwealth*, 71 Va. App. 492, 509 (2020) (citing Code § 19.2-327.13). Livesay's claim rests

- 9 -

primarily on Dr. Carey's proffered report.[15] Then, we "examine the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Haas v. Commonwealth*, 74 Va. App. 586, 631 (2022) (quoting *In re Watford*, 295 Va. 114, 124 (2018)). We must consider "the likelihood of a reasonable juror finding [Livesay] guilty beyond a reasonable doubt once all of the evidence has been fairly considered." *Id.* (quoting *Watford*, 295 Va. at 124). "It is not enough for a petitioner to merely establish the existence of some conflicting evidence that introduces the possibility of reasonable doubt." *Id.* (quoting *Watford*, 295 Va. at 124). Rather, Livesay must "establish such a high probability of acquittal, that this Court is reasonably certain that no rational fact finder would have found him guilty." *Id.* at 632 (quoting *Watford*, 295 Va. at 124).

Livesay does not dispute that he fatally shot English in the head. Rather, he contends that no rational trier of fact would convict him of first-degree murder based on his mental state at the time of the killing. He raises two related but distinct theories. First, he contends that his proffered evidence shows that he was involuntarily intoxicated, so that a rational factfinder would conclude that he was legally insane when he killed English. If we agree that every rational trier of fact would find that he was involuntarily intoxicated, such a finding would completely negate his guilt and we would be required to "grant the writ, and vacate the conviction" under Code § 19.2-327.13.[16] Second, he argues that he was so intoxicated that no rational factfinder would conclude that he killed her with the premeditation required for first-degree murder. If we agreed that every rational trier of fact would conclude that the element of premeditation was not satisfied, we

---

[15] Livesay proffered additional documents supporting his claim of innocence, including advisories and other communications from the FDA, articles, an opinion rendered in an unrelated federal civil case, and a transcript of testimony at a 2010 Congressional hearing on veteran suicide. On their face, these documents do not purport to relate to the facts of this case. Livesay avers in his petition that he discovered them after he hired Dr. Carey "to conduct a review and evaluation of the facts, circumstances, and evidence related to [his] conviction." Further, Dr. Carey references several of the documents in his report. These other proffered documents add negligible probative value to Dr. Carey's report, so our application of Code § 19.2-327.11(A)(vii) focuses on the report itself.

[16] That Livesay presents new evidence relevant to an affirmative defense is no bar to a petition for actual innocence under Code §§ 19.2-327.10 and -327.11(A), so long as the other requirements of the statute are satisfied.

- 10 -

would then consider whether "there remains in the original trial record evidence sufficient to find the petitioner guilty or delinquent beyond a reasonable doubt of a lesser included offense," and if so, "modify the order of conviction" accordingly and remand for resentencing. Code § 19.2-327.13.[17]

We now address why each of these theories falls short.

A. Insanity and Involuntary Intoxication

"[I]nsanity is an affirmative defense that the defendant must establish to the satisfaction of the fact finder."[18] *Khine v. Commonwealth*, 75 Va. App. 435, 448 (2022) (quoting *Brown v. Commonwealth*, 68 Va. App. 746, 795 (2018)). "Virginia recognizes two tests for determining whether a defendant is not guilty by reason of insanity: the *M'Naghten* test and the irresistible-impulse doctrine." *Id.* To satisfy the *M'Naghten* test, the defendant must prove that he was laboring "under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did

---

[17] Federal courts are split on whether an actual innocence claim raised under the federal habeas statutes can rest on a defense that merely reduces the degree of a defendant's guilt. *Cf. Wilson v. Greene*, 155 F.3d 396, 405 (4th Cir. 1998) (considering defendant's voluntary-intoxication claim, which would have reduced his conviction from premeditated murder to, at most, second-degree murder), *with Rozzelle v. Sec'y, Fla. Dep't of Corr.*, 672 F.3d 1000, 1015 (11th Cir. 2012) (concluding no relief is possible for "petitioners, like Rozzelle, who did the killing and whose alleged 'actual innocence' of a non-capital homicide conviction is premised on being guilty of only a lesser degree of homicide"). The General Assembly has conclusively resolved that question here in the plain text of Code § 19.2-327.13 (permitting the Court to modify a conviction if "the Court finds that there remains in the original trial record evidence sufficient to find the petitioner guilty or delinquent beyond a reasonable doubt of a lesser included offense").

[18] Under the common law, "[a]ny person not deemed legally insane was 'presumed to be sane, and to possess a sufficient degree of reason to be responsible for [their] crimes.'" *Calokoh v. Commonwealth*, 76 Va. App. 717, 731 (2023) (second alteration in original) (quoting *Schmuhl v. Commonwealth*, 69 Va. App. 281, 300 (2018)). "Thus, short of raising an insanity defense, a defendant was not permitted to present evidence of his or her mental state or diminished capacity to negate mens rea." *Id.* In 2021, however, the General Assembly enacted Code § 19.2-271.6, which abrogated the common law. *Id.* at 729. The statute provides that, in criminal cases, "evidence offered by the defendant concerning the defendant's mental condition at the time of the alleged offense, including expert testimony, is relevant . . . and shall be admitted if" it "(i) tends to show the defendant did not have the intent required for the offense charged and (ii) is otherwise admissible pursuant to the general rules of evidence." Code § 19.2-271.6(B). Code § 19.2-271.6(B) provides that "to establish the underlying mental condition the defendant must show that his condition existed at the time of the offense and that the condition satisfies the diagnostic criteria for (i) a mental illness, (ii) a developmental disability or intellectual disability, or (iii) autism spectrum disorder . . . ." The Court asked the parties to provide supplemental briefing as to whether Code § 19.2-271.6 applies here, and neither party argued that it does.

- 11 -

not know he was doing what was wrong." *Id.* (quoting *Price v. Commonwealth*, 228 Va. 452, 457 (1984)). "By contrast, '[t]he irresistible impulse defense is available when the accused's mind has become so impaired by disease that he is totally deprived of the mental power to control or restrain his act.'" *Id.* (alteration in original) (quoting *Vann v. Commonwealth*, 35 Va. App. 304, 313 (2001)). This impulse "must be 'distinguished from mere passion or overwhelming emotion not growing out of, and connected with, a disease of the mind.'" *Id.* at 450 (quoting *Thompson v. Commonwealth*, 193 Va. 704, 717 (1952)).

"[I]nvoluntary intoxication is recognized in the Commonwealth as an alternative basis for an insanity defense."[19] *Schmuhl v. Commonwealth*, 69 Va. App. 281, 302 (2018), *aff'd*, 298 Va. 131 (2019). The defense is "proven not by showing that the defendant had a pre-existing mental disease or defect, but by showing that his involuntary intoxication produced a defect in his *mens rea* that rose to the level of insanity, as set by the *M'Naghten* rule." *Id.* "In other words, involuntary intoxication only negates *mens rea* if the accused can show that he met the legal standard for insanity." *Id.* at 303-04.

We conclude that Dr. Carey's report does not establish that every rational factfinder would have found Livesay not guilty of first-degree murder because he was involuntarily intoxicated. Livesay contends that "Dr. Carey's expert medical opinion regarding the likelihood that [his] use [of] Effexor and Xanax was a proximate cause of the killing" "supports" his new assertion of insanity by involuntary intoxication. But Dr. Carey's report addresses neither the *M'Naghten* test nor the irresistible impulse doctrine. Rather, his conclusion speaks only to the likelihood that Livesay's use of Effexor and Xanax was a cause of the killing. Even if a factfinder agreed that Livesay's purported use of Effexor and Xanax was a cause of Livesay's criminal conduct, that conclusion in no way compels a finding that Livesay did not appreciate the nature and character of his actions, or that he was deprived of the mental power to control them. *See Khine*, 75 Va. App. at 448.

---

[19] Livesay does not argue that his consumption of Effexor and Xanax was forced. Rather, he asserts that his intoxication was functionally involuntary because it resulted from "the unskillfulness of his physician" in prescribing Effexor in combination with Xanax.

Further, at least some rational factfinders examining the totality of the record evidence would likely reject Livesay's assertion that he was legally insane due to involuntary intoxication when he fatally shot English. "[T]he word 'impulse' implies that which is sudden, spontaneous, unpremeditated." *Vann*, 35 Va. App. at 314 (quoting *Rollins v. Commonwealth*, 207 Va. 575, 580 (1966)). "Acting on an impulse involves no planning; it could occur at any place in the presence of anyone." *Id.*

The record before us contains evidence that Livesay premeditated English's killing rather than acting on impulse. After arriving at English's workplace uninvited and arguing with her earlier in the day, Livesay returned to the mall near the end of her workday with a firearm loaded with hollow point bullets. He located her car in the parking lot and tampered with her door lock to prevent her from entering and driving away. When English approached her car with the Weidmans, Livesay accosted English, ignoring her pleas to leave her alone. Multiple disinterested witnesses saw Livesay push English to the ground, stand over her, and shoot her in the head before fleeing. At least two of the witnesses saw Livesay attempt to shoot English a second time after he had already fired what he later acknowledged he knew was a fatal shot to the head. And Livesay had told his ex-wife that he would hurt English if he believed she was "seeing" somebody else. In sum, we conclude that at least some rational factfinders assessing this evidence would conclude that Livesay planned to kill English. Given the incompatibility between planning and impulse, Livesay has failed to show that every factfinder would conclude that an irresistible impulse induced by his medication caused him to kill English. *See* Code § 19.2-327.11(A)(vii).

As to the *M'Naghten* test, a factfinder would consider that—starting with his interview with Sergeant Faries the day after the killing and continuing through his allegations in his petition—Livesay has repeatedly claimed that he *accidentally* shot English in the head while trying to compel her to shoot *him* with his loaded firearm. The evidence that Livesay accidentally shot English is incompatible with the argument that Livesay did not "know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." *Khine*, 75 Va. App. at 448. At least some rational factfinders would also give weight to the accounts of the disinterested eyewitnesses summarized above. Those accounts belie Livesay's

- 13 -

claim that he accidentally shot English during his desperate attempt to convince her to shoot him. In addition, the factfinder would also consider Livesay's flight from the scene—which he accomplished by brandishing a firearm at a bystander who pursued him—as evidence to support that Livesay understood what he had done and the wrongfulness of the act. *See Jones v. Commonwealth*, 279 Va. 52, 58 (2010) (explaining that a court may consider evidence of flight from a crime scene "in the context of all the facts presented as evidence tending to show the defendant's consciousness of guilt of the crime committed").

We conclude that Livesay has failed to show that every factfinder would conclude that the combined effect of Effexor and Xanax rendered him incapable of knowing right from wrong considering the rest of the evidence. *See* Code § 19.2-327.11(A)(vii).

B. Intoxication and Premeditation

Livesay also asserts that the new evidence, at best, "supports a finding that as a result of his [voluntary] ingestion of Effexor and Xanax he became so greatly intoxicated that he was incapable of deliberating or premeditating." It is undisputed that "voluntary intoxication can negate the deliberation and premeditation required for first degree murder."[20] *Tisdale v. Commonwealth*, 65 Va. App. 478, 482 (2015) (quoting *Wright v Commonwealth*, 234 Va. 627, 629 (1988)). Thus, a defendant may "'negate the specific intent requisite for . . . first-degree murder by showing that he was so greatly intoxicated as to be incapable of deliberation or premeditation,' and thereby reduce the conviction from first-degree murder to second-degree murder." *Id.* (quoting *Essex v. Commonwealth*, 228 Va. 273, 281 (1984)).

"To premeditate means to adopt a specific intent to kill, and that is what distinguishes first and second degree murder." *Kirby v. Commonwealth*, 50 Va. App. 691, 700 (2007) (quoting *Remington v.*

---

[20] Livesay claims that his alleged intoxication was involuntary, not voluntary. We assume for the sake of argument that, to the extent that voluntary intoxication can negate premeditation for purposes of defending a first-degree murder charge, involuntary intoxication can as well. As discussed supra at footnote 18, Code § 19.2-271.6 was enacted in 2021, decades after Livesay's offense, and he does not ask us to consider whether the statute is relevant to a later-filed actual innocence petition. Thus we do not evaluate the impact of Code § 19.2-271.6(G)'s provision that "[n]othing in this section shall be construed as permitting the introduction of evidence of voluntary intoxication."

*Commonwealth*, 262 Va. 333, 352 (2001)). The specific intent to kill "need not exist for any specified length of time prior to the actual killing; the design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Id.* (quoting *Remington*, 262 Va. at 352). The Commonwealth often must prove premeditation by circumstantial evidence. *Fields v. Commonwealth*, 73 Va. App. 652, 674 (2021). Factors that a jury may consider in deciding whether a criminal act was premeditated include "the brutality of the attack, and whether more than one blow was struck, the disparity in size and strength between the defendant and the victim, the concealment of the victim's body, and the defendant's lack of remorse and efforts to avoid detection." *Avent v. Commonwealth*, 279 Va. 175, 208 (2010) (quoting *Epperly v. Commonwealth*, 224 Va. 214, 232 (1982)).

Livesay has not shown that every rational factfinder would acquit him of first-degree murder because he was so intoxicated that he could not premeditate. Dr. Carey's report did not address whether Livesay was so intoxicated that he could not form the specific intent to kill. And even if a factfinder agreed that Livesay's combined use of Effexor and Xanax played a role in the killing, that alone would not compel the conclusion that those medications intoxicated him to a degree that he was incapable of premeditation. Other evidence in the record supports the opposite conclusion—that Livesay could and did specifically intend to kill English. Livesay himself claims in his petition that he was extremely distraught that English did not wish to resume their romantic relationship. He also told his ex-wife before the shooting that he would "hurt [English] if he found out that she was seeing another man."

Moreover, on the day of the shooting, Livesay tampered with the lock of English's car door and waited for her in the parking lot with a loaded firearm.[21] When she walked to her car after work, Livesay confronted her; she told him to leave her alone and attempted to pull away from him. And we have already recounted the reports from multiple disinterested witnesses that conflict with Livesay's argument that he planned to commit suicide by having English shoot him and that he did not plan to murder her. Thus,

---

[21] Code § 18.2-32 also defines murder by "lying in wait" as first-degree murder. Livesay has not addressed this separate basis for a first-degree murder conviction.

Livesay has not shown that no rational factfinder would find there was evidence of premeditation and convict him of first-degree murder. *See* Code § 19.2-327.11(A)(vii).

CONCLUSION

For the above reasons, Livesay has not established by a preponderance of the evidence that every rational factfinder would find him not guilty of first-degree murder based on his proffered evidence. *Haas*, 74 Va. App. at 631; Code § 19.2-327.11(A)(vii). We conclude no evidentiary hearing is necessary because no further development of the facts is needed to resolve this case. Accordingly, we dismiss his petition.

We direct the Clerk of this Court to send copies of this order to Livesay's counsel, to the Attorney General, and to the Commonwealth's Attorney for the City of Colonial Heights.

This order shall be published.

A Copy,

Teste:

A. John Vollino, Clerk

By: *original order signed by a deputy clerk of the Court of Appeals of Virginia at the direction of the Court*

Deputy Clerk